2007 WY 37

**Eyvette Marie TALLEY, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 05–268.

Supreme Court of Wyoming.

March 6, 2007.

258

Representing Appellant: Ken Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel.

Representing Appellee: Patrick J. Crank, Attorney General; Paul Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; James Michael Causey, Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL *, KITE, and BURKE, JJ.

BURKE, Justice.

[¶1] Ms. Talley appeals her convictions for felony murder, attempted aggravated robbery, and conspiracy to commit aggravated robbery. She contends that prosecutorial misconduct denied her a fair trial. We affirm.

## ISSUES

[¶2] Ms. Talley presents two issues:

1) Did prosecutorial misconduct occur when the prosecutor questioned Appel-

* Chief Justice at time of oral argument.

lant about whether other witnesses were "lying"?

2) Did the prosecutor commit misconduct in closing argument by referring to an accomplice's inability to testify?

### FACTS

[¶ 3] In February of 2004, Ms. Talley traveled with her boyfriend, Brian Rawle, her brother, Marco Lemus, and Marco's wife, Tiffany Lemus, from South Dakota heading toward Arizona, where they expected to find employment. Ms. Talley brought her three children, including her teenage daughter, FT. The Lemus couple brought their three children. All ten individuals traveled in one vehicle, a 1989 Cadillac Deville. During the trip, the adults engaged in illegal drug use. On their way to Arizona, they made several stops including a planned stop in Kemmerer, Wyoming, where Mr. Rawle had previously lived for a short time.

[¶ 4] From his time spent in Kemmerer, Mr. Rawle had a connection with an alleged drug dealer, Manuel Leon–Leyva. The evidence presented by the State showed that Ms. Talley, her brother, and Mr. Rawle conspired sometime during their trip to rob Mr. Leon–Leyva. When they arrived in Kemmerer, Mr. Rawle called Mr. Leon–Leyva and arranged a meeting at a local grocery store. The three armed themselves with steak knives before the meeting. They parked the Cadillac behind the store. Ms. Talley and her two co-conspirators exited the vehicle and went to the other side of the building. Mr. Leon–Leyva arrived to meet them, driving his 1992 Isuzu Trooper. Mrs. Lemus and the children remained in the Cadillac.

[¶ 5] Some time later, the Isuzu pulled up and parked in front of the Cadillac. Mrs. Lemus observed the Isuzu rocking and moving, and one of the children said she thought that someone was being beat up. Mrs. Lemus approached the Isuzu to see what was happening. Ms. Talley emerged from the Isuzu covered in blood. She escorted Mrs. Lemus back to the Cadillac. Ms. Talley sat in the driver's seat and placed her knife between the front seat cushions. She then drove the Cadillac, following the Isuzu driven by Mr. Rawle, to a remote area outside of town. Ms. Talley, her boyfriend, and her brother set the Isuzu on fire with Mr. Leon–Leyva's body inside.

[¶ 6] The charred vehicle and remains were later discovered by an oilfield worker who contacted law enforcement. An investigation ensued, and it was discovered that Mr. Leon–Leyva had suffered numerous stab wounds. Ms. Talley was eventually charged with three counts: 1) felony murder in violation of Wyo. Stat. Ann. § 6–2–101(a) (Lexis-Nexis 2003); 2) attempted aggravated robbery in violation of Wyo. Stat. Ann. § 6–1–301 and § 6–2–401(c)(ii) (LexisNexis 2003); and 3) conspiracy to commit aggravated robbery in violation of Wyo. Stat. Ann. § 6–1–303(a) and § 6–2–401(c)(ii) (LexisNexis 2003).

[¶ 7] At trial, the State presented the testimony of several witnesses. In addition to testimony from witnesses regarding the discovery of Mr. Leon–Leyva's body and the criminal investigation, Tiffany Lemus and FT testified about the events they witnessed during the trip. Two other witnesses, James "JR" Rutledge and Cindy Sanchez, testified that Ms. Talley had bragged to them that she had cut the throat of a drug dealer in Wyoming and related details of the crime Ms. Talley shared with them. Brian Rawle and Marco Lemus did not testify, but incriminating statements they made to the police were discussed by several witnesses during the trial. Ms. Talley testified on her own behalf and admitted to being present but denied direct involvement in the robbery or murder of Mr. Leon–Leyva.

[¶ 8] The jury found Ms. Talley guilty on all three counts. She was sentenced to a prison term of eight to ten years on the conspiracy conviction. The attempt conviction merged with the felony murder conviction for sentencing, and the district court imposed a life sentence, to be served consecutive to the eight to ten year prison term. Ms. Talley timely appealed. Further facts will be discussed as needed in our review of Ms. Talley's claims of prosecutorial misconduct.

## STANDARD OF REVIEW

[¶ 9] Allegations of prosecutorial misconduct are reviewed by reference to the entire record and hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial. Similarly, the propriety of any comment within a closing argument is measured in the context of the entire argument. *Dysthe v. State*, 2003 WY 20, ¶ 22, 63 P.3d 875, 884 (Wyo.2003). Reversal is not warranted unless a reasonable probability exists, absent the error, that the appellant may have enjoyed a more favorable verdict. *Id.* Ms. Talley has the burden of demonstrating plain error because no objection was made at trial to either the prosecutor's questioning or to the closing argument. Plain error exists when: 1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right which materially prejudiced him. *Id.*, ¶ 23, 63 P.3d at 884.

## DISCUSSION

### Improper questioning

[¶ 10] Ms. Talley claims the prosecutor committed misconduct while cross-examining her, by asking her whether other witnesses were lying. Although a defendant who testifies in a criminal case may be cross-examined regarding his credibility just like any other witness, there are limits placed upon the prosecutor. *Jensen v. State*, 2005 WY 85, ¶ 20, 116 P.3d 1088, 1095 (Wyo.2005). A prosecutor may not cross-examine a defendant using the "lying" or "mistaken" technique. Such questions are improper, and use of them amounts to misconduct. *Id.; Beaugureau v. State*, 2002 WY 160, ¶ 17, 56 P.3d 626, 635–36 (Wyo.2002).

[¶ 11] Courts prohibit "were-they-lying" questions for several reasons: 1) they invade the province of the jury, as determinations of credibility are for the jury; 2) they are argumentative and have no probative value; 3) they create a risk that the jury may conclude that, in order to acquit the defendant, it must find that a contradictory witness has lied; 4) they are inherently unfair, as it is possible that neither the defendant nor the contradictory witness has deliberately misrepresented the truth; and 5) they create a "no-win" situation for the defendant: if the defendant states that a contradictory witness is not lying, the inference is that the defendant is lying, whereas if the defendant states that the witness is lying, the defendant risks alienating the jury. *State v. Maluia*, 107 Hawai'i 20, 108 P.3d 974, 978 (2005). *Accord Jensen*, ¶ 20, 116 P.3d at 1095–96; *State v. Graves*, 668 N.W.2d 860, 872–73 (Iowa 2003); and *State v. Thompson*, 266 Conn. 440, 832 A.2d 626, 648 (2003).

[¶ 12] The State agrees that Ms. Talley was subjected to cross-examination prohibited by *Jensen* and *Beaugureau*. At trial, she was questioned as follows:

[Prosecutor]: Never passed those knives out amongst the four of you like your daughter's testified to?

[Ms. Talley]: No, sir.

Q: You never had a knife in your hand like Tiffany testified to?

A: No, sir.

Q: And never had knives like Cindy Sanchez testified to?

A: No, sir.

Q: Never had a knife like J.R. Rutledge testified to?

A: No, sir.

**Q: And everyone who's testified in this courtroom this week has lied except you?**

**A: Yes, sir.**

**Q: You are the one that's telling the truth?**

**A: Yes, I am.**

Q: You've got a lot at stake in this; don't you?

A: Of course, I do, my life.

Q: You have had a lot of time to think about it; haven't you?

A: Yes, I have.

(Emphasis added.) Later in the cross-examination, similar questioning occurred:

Q: Now you said that Tiffany got out of the car out there where the car was burned?

A: Yes, I did.

Q: [FT] said Tiffany did not?

A: Yes, I know.

 . . .

Q: **So again those two are lying and you are telling the truth?**

A: **I'm telling the truth.**

Q: Said you had nothing to do with starting the car on fire?

A: No, I didn't.

Q: You've heard Tiffany testify you were out when the car got set on fire, . . . you heard [FT] testify to that; correct?

A: Yes, I did.

Q: Okay. You heard J.R. Rutledge testify, that you told him that you set a car on fire. You heard Cindy Sanchez testify to that?

A: They said that I did.

Q: **And again these people are all lying?**

A: **Yes, they are.**

Q: **And you are telling the truth?**

A: **Yes, they are [sic].**

Q: You said you had no blood on you?

A: No, I didn't.

(Emphasis added.) Accordingly, the State concedes that Ms. Talley has demonstrated a violation of a clear and unequivocal rule of law, thereby satisfying the first two prongs of the plain error standard. However, the State contends that Ms. Talley has failed to prove prejudice to her right to a fair trial.

■ [¶ 13] In support of her claim of prejudice, Ms. Talley contends that the State's evidence was not overwhelming and that to convict her, the jury had to believe the testimony of her daughter, FT, and Tiffany Lemus. FT was the only witness who testified concerning the conspiracy, and Mrs. Lemus was a key witness for the State. Ms. Talley points to inconsistencies in the testimony of these two witnesses in an attempt to demonstrate that the State's case against her was not solid. She reasons that the jury could not have reasonably resolved the discrepancies to arrive at a guilty verdict, and instead, the jury must have been influenced by the prosecutor putting her in the unfavorable light of calling her own relatives liars.

[¶ 14] We examine prejudice in light of the entire record. It is apparent from the record that Ms. Talley embraced the idea that other witnesses were lying. Her theory of defense was that witnesses for the State had been threatened or induced to concoct stories implicating her. Defense counsel introduced this theory in his opening statement, asking the jury to pay close attention to how the investigation developed and how certain details recalled by witnesses did not surface until after they were included in police reports. This theory was continued throughout the trial and pervaded the questioning of most witnesses. Defense counsel commented extensively upon the credibility of the State's witnesses in closing argument and used the term "lying." For example, he began his discussion as follows:

> What I want to talk about, credibility of the witnesses, believability of witnesses. Now if the instructions talk about, you know, somebody's testified falsely, now that doesn't necessarily mean somebody's lying, intentionally lying, there's a lot of reasons you will come up with incorrect testimony. Lying is one of them. I think we have got witnesses here that may be doing both. Some witnesses are doing one thing, some another, some maybe a little of both. I think J.R. and Cindy Sanchez are plain out lying. Tiffany, I think probably is doing some of both.

■ [¶ 15] Ms. Talley discounts the impact of her theory of defense or the words used by her trial counsel. True, we have held prosecutors to a higher standard, imposing upon them a duty to refrain from using improper questions. *Jensen*, ¶ 22, 116 P.3d at 1097. We determined that a defendant cannot "open the door" to the type of improper questioning used by the prosecutor in this case. *Id.* However, we agree with the reasoning of the Iowa Supreme Court that a defendant's invitation or instigation is a relevant consideration in assessing the prejudice element. *Graves*, 668 N.W.2d at 873. *Accord State v. Duran*, 140 N.M. 94, 140 P.3d 515, 524 (2006) (discussing assessment of "fundamental error").

[¶ 16] To evaluate the prejudice of improper "were-they-lying" questions, courts weigh several factors: 1) the severity and pervasiveness of the misconduct; 2) the significance of the misconduct to the central issues in the case; 3) the strength of the State's evidence; 4) the use of cautionary instructions or other curative measures; and 5) the extent to which the defense invited the misconduct. *Graves*, 668 N.W.2d at 877. In light of the defense's repeated and extended efforts to explore other witnesses' motivations to fabricate their stories, the prosecutor's questions of Ms. Talley could not have been that surprising to her or to the jury. The questioning, while improper, was relatively brief in duration. The prosecutor did not emphasize Ms. Talley's responses to these questions in his closing argument. Instead, he echoed the judge's instructions that it was the jury's role to determine the credibility of the witnesses.

[¶ 17] After reviewing the entire record, we cannot conclude that in the absence of the prosecutor's misconduct, a reasonable possibility exists that the verdict would have been more favorable to Ms. Talley. For the most part, the evidence concerning the meeting with Mr. Leon–Leyva, and the subsequent burning of his vehicle and body, was undisputed. During her testimony, Ms. Talley refuted a plan to rob the victim but admitted that she had entered the victim's vehicle as part of a drug deal. She admitted to being an active participant in the subsequent cover-up. However, the weight of the evidence identified Ms. Talley as an armed and active participant in the robbery and murder. Although the testimony of FT and Mrs. Lemus differed in some respects, many aspects were consistent and were corroborated by the physical evidence. Both testified that Ms. Talley had a knife and had blood on her. Other witnesses related Ms. Talley's own admissions of her participation in the robbery and the murder. Evidence was presented that Ms. Talley and her co-conspirators possessed personal effects belonging to Mr. Leon–Leyva, a brown wallet and a gold chain. Even taking into account the impropriety of the prosecutor's cross-examination,

the evidence was sufficient to sustain Ms. Talley's convictions. Accordingly, we conclude that Ms. Talley has failed to demonstrate prejudice from the prosecutor's misconduct.

### Closing argument

[¶ 18] In her second claim of error, Ms. Talley challenges statements made by the prosecutor during his rebuttal argument:

Marco is charged with a crime. Marco can't come here and testify. I can't put him on the stand, he has the right to remain silent. [Defense counsel] knows that.

She contends the prosecutor committed misconduct by telling the jury that Marco Lemus did not testify because he would have invoked his Fifth Amendment privilege. The State asserts that the reference did not violate a clear and unequivocal rule of law. However, we find the prosecutor's statement concerning Marco improper because it referred to an extraneous matter that should not have been before the jury.

[¶ 19] It is well-settled law that a prosecutor must restrict his argument to the evidence presented to the jury. *Doherty v. State*, 2006 WY 39, ¶ 20, 131 P.3d 963, 970 (Wyo.2006); *Adams v. State*, 2005 WY 94, ¶ 18, 117 P.3d 1210, 1217 (Wyo.2005); *Whitney v. State*, 2004 WY 118, ¶ 87, 99 P.3d 457, 486 (Wyo.2004); *White v. State*, 2003 WY 163, ¶ 28, 80 P.3d 642, 653 (Wyo.2003); *Dysthe*, ¶ 24, 63 P.3d at 884–85; *Montoya v. State*, 971 P.2d 134, 136–37 (Wyo.1998); *Dice v. State*, 825 P.2d 379, 384 (Wyo.1992). Marco Lemus did not testify. The prosecutor's explanation for his absence in the courtroom was neither a fair comment upon evidence that was presented nor a reasonable inference to be drawn therefrom.

[¶ 20] It may very well be that the prosecutor was prohibited from calling Marco as a witness by the principles expressed in *Namet v. United States*, 373 U.S. 179, 187, 83 S.Ct. 1151, 1155, 10 L.Ed.2d 278 (1963) and *Douglas v. Alabama*, 380 U.S. 415, 420, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965).[1] It

---

1. Pursuant to *Namet* and *Douglas,* a prosecutor

may not call a witness closely associated with the

would be impermissible for the State to build its case against Ms. Talley by placing her co-conspirators on the stand so that they would invoke their Fifth Amendment privilege. To a certain extent, advising the jury of that circumstance had the same effect.

[¶ 21] "The potential prejudice to a defendant when a prosecutor refers to facts outside the record arises because the prosecutor has effectively assumed the role of an unsworn witness, lending the dignity and prestige of his office to the State's case." *Montoya,* 971 P.2d at 137 (quoting Joseph F. Lawless, .Jr., *Prosecutorial Misconduct* § 9.22 cmt. (1985)). A prosecutor should not suggest that he has independent knowledge of facts that could not be presented to the jury. *State v. Ceballos,* 266 Conn. 364, 832 A.2d 14, 41 (2003). Jurors recognize the prosecutor's role as a leader of law enforcement in their community; they naturally regard the prosecutor as a symbol of authority; that recognition and regard may impress a jury, causing jurors to give significant weight to the words of a prosecutor. *Earll v. State,* 2001 WY 66, ¶ 12, 29 P.3d 787, 791 (Wyo. 2001). Explaining Mr. Lemus' absence by stating that he would have invoked his privilege not to incriminate himself was therefore improper.

[¶ 22] Ms. Talley contends that the error prejudiced her right to a fair trial. We consider the nature of the error in question within the context of the quality of the prosecution's case against the accused. *Earll,* ¶¶ 13–14, 29 P.3d at 791. We also evaluate the gravity of the error, the likely impact on the average juror, whether the comment was deliberately placed before the jury to divert attention to extraneous matters, and whether the error was invited by defense counsel. *Trujillo v. State,* 2002 WY 51, ¶ 15, 44 P.3d 22, 28 (Wyo.2002); *Warner v. State,* 2001 WY 67, ¶ 23, 28 P.3d 21, 29 (Wyo.2001). We are always mindful that "[t]rial counsel may decide, for tactical rea-

sons, not to object during closing argument concluding that calling further attention to a particular statement may add to its credibility." *Adams v. State,* 2005 WY 94, ¶ 18, 117 P.3d 1210, 1217 (Wyo.2005). "Plain error in closing argument must remain hard to find because otherwise the trial court becomes charged with an adversary responsibility to control argument even when objection is not taken by the opposing attorney." *Dice,* 825 P.2d at 385.

[¶ 23] When placed in context, we believe the prosecutor's comment was not a deliberate attempt to inject extraneous matters for the jury's consideration. The apparent motivation was to respond to the argument of defense counsel which focused upon Marco Lemus. In his closing remarks, defense counsel argued that Marco had been the only one who was with the victim when the fatal wounds were inflicted.

> One of [the] things we probably will never know. I guess there's—right now there's only one person alive that knows it, Marco, sitting over in the jail. He knows what happened in there. Eyvette doesn't know exactly. All she knows is what she saw, but there's certainly reason for Marco to be in there making the deal; got the money, tiny guy, easy to rob, speaks Spanish, lots of reasons.

Defense counsel then sought to discredit Marco's statements:

> That's basically human nature. When the crosshairs are on me, divert the blame, just like Marco did. . . . Oh, well, okay, but if I go down everybody else is going down. Only thing I want is everybody gets charged equally, everybody goes down if I'm going. Spread the blame. Who knows, in Marco's mind maybe he'll get a better deal. Maybe he can be the State's witness against everybody else. Didn't work out that way. But maybe that will happen. That's our nature, so you can

---

defendant in criminal activities in order to elicit the Fifth Amendment privilege against self-incrimination, and reversal may be required in two situations: 1) when the prosecutor consciously attempts to influence the jury by building its case out of inferences arising from use of the testimonial privilege, thus depriving a defendant of due

process of law; or 2) when inferences from a witness's refusal to answer add critical weight to the prosecutor's case in a manner which denies opportunity for cross-examination, and thus unfairly prejudices the defendant by precluding him from exercising his Sixth Amendment right to confrontation.

concoct this story. He was there through the whole thing so he knows enough details to show where everything was, but he starts giving the stuff, implying, yes, sir, Tiffany was involved from the very beginning.... And yes, sir, there was Eyvette sawing this guy's head off. And yes, sir, we sold a gold necklace, and gives them all these details.... Now we have got first degree murder because Marco said there was a conspiracy to rob this guy, even though we have had interview after interview with Tiffany who said not a thing was said about that.

In rebuttal, the prosecutor responded:

[Defense counsel] told you that the State has asked you to forget inconsistent testimony. I've never asked you to do that. Think real hard. I don't think you will find that I ever asked you to do that.

I've told you that there are inconsistencies and that you get to sort through them. You are the finders of fact. Mr. Brown told you who he thought was lying. We don't get to tell you who we think is lying, you get to decide who you believe and who you don't and whether you reject all of their testimony or part of their testimony. That's for you to decide.

There are inconsistencies out there, you can't forget them, you've heard them. But what I want you to do is to sort through what you've heard and look at what the evidence shows....

[Defense counsel] talks to you about Marco. That's all we hear about is Marco, Marco, Marco, Marco, Marco. [Defense counsel] told you towards the end he says we're not here to determine what Marco did. **Marco is charged with a crime. Marco can't come here and testify. I can't put him on the stand, he has the right to remain silent. [Defense counsel] knows that.**

Let's quit worrying about Marco. Let's talk about Eyvette. She's the one who is charged here....

(Emphasis added.)

[¶ 24] The nature of the prosecutor's comment was an aside rather than a point of emphasis. The reference was fleeting and it was promptly followed by an attempt to redirect the jury to the evidence in the case. Additionally, the jury was instructed several times that argument of counsel was not evidence.

[¶ 25] We also find it significant that the prosecutor did not ask the jury to draw an inference from Marco's absence. An unfavorable inference from his refusal to testify might be that he is guilty. However, under the unique circumstances of this case, such an inference could have been as equally favorable to Ms. Talley because she argued that her brother was the principal actor in the robbery and murder. Even if the jury inferred that Marco did not testify because he was guilty of the robbery and murder, that inference was consistent with Ms. Talley's theory of defense and was not prejudicial. Accordingly, we find that the prosecutor's comment did not amount to plain error requiring reversal.

[¶ 26] Affirmed.