2011 WY 62

**Stephen Bernard BARNES,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

**No. S–10–0078.**

Supreme Court of Wyoming.

April 13, 2011.

Representing Appellant: Diane Lozano, State Public Defender; Tina N. Olson, Appellate Counsel; and Kirk A. Morgan, Assistant Appellate Counsel. Argument by Mr. Morgan.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage; D. Michael Pauling, Senior Assistant Attorney General; Jessica Y. Frint, Student Director, Prosecution Assistance Program; and David R. Hopkinson, Student Intern. Argument by Mr. Hopkinson.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

HILL, Justice.

[¶ 1] Appellant, Stephen Bernard Barnes (Barnes), contends that his conviction for larceny should be reversed because the prosecuting attorney committed misconduct by questioning witnesses using a technique wherein the prosecutor repeatedly asked Barnes if the witnesses against him were lying (or other similar words) when their testimony tended to contradict his. This tactic of the prosecutor persisted during closing argument. Barnes' attorney did not object to the questions and did not ask for a curative instruction from the presiding judge. On the basis of that issue, we will reverse and remand for further proceedings in the district court, consistent with this opinion. Barnes also contends that his defense attorney did not provide effective assistance of counsel. Because we reverse on the basis noted above, we need not address his second issue.

## ISSUES

[¶ 2] Barnes raises these issues:

I. Did the prosecutor commit misconduct when he cross-examined [Barnes] as to whether other witnesses were lying or mistaken?

II. Was [Barnes] provided effective assistance of counsel?

The State's summary of the issues comports with that set out by Barnes, but qualifies Issue I as the "limited use" of such questioning.

## FACTS

[¶ 3] Barnes had a history of alcoholism and mental disorders. There is very little in the record about that other than Barnes' own testimony, but it is corroborated in part by medical records from the United States Veteran's Administration, Sheridan Medical Center. Those records reveal only the medications prescribed to Barnes while he was a patient there. Of particular interest here were these medications: oxycodone for pain; sertraline HCL (100 mg) for depression; sertraline TAB (150 mg) for depression; and trazodone for insomnia.

[¶ 4] On or about September 9, 2008, Barnes was hitchhiking from Casper to Gillette. Tom Jarrard (Jarrard) took note of Barnes because he had a United States flag tied around his possessions. Jarrard made what he described as a "dummied up" decision to offer Barnes a lift, thinking he might be a returning Middle East war veteran trying to make his way home. Barnes told Jarrard he was trying to get home (to Massachusetts) and that he was broke. Jarrard offered Barnes some work on his nearby ranch digging a trench from a water well to an RV that was being used as a temporary ranch home. At that site, Jarrard also had a blue flatbed pickup and a nicely restored sheepherder's wagon. There was some canned/preserved food in the wagon and Jarrard provided Barnes with some additional fresh food. Jarrard said that he would return in two or three days and assign additional work to Barnes, as well as bring more food. Jarrard intended to employ Barnes for a couple of weeks. Barnes testified that he had about $1,200.00 on him when he went to work for Jarrard. Barnes testified that he did the work Jarrard asked him to do; Jarrard said he did not.

[¶ 5] When Jarrard returned on September 12, 2008, Barnes was gone, as was the blue flatbed pickup, a television from the RV, a shot gun from the RV, an electric drill from

the RV, and all the liquor that had been stored in the RV. It was eventually discovered that all of the gasoline had been siphoned from the RV (maybe 3/4 of a tank) and presumably put into the pickup, since Jarrard knew the pickup was very close to being empty on fuel. He called the thefts into the Johnson County Sheriff and found out almost immediately that Barnes was already in custody in Laramie.

[¶ 6] In the meantime, apparently late in the day on September 11, 2008, Barnes took all of his remaining medications, got drunk, and contemplated suicide by shooting himself with a shotgun he found on the premises. From this point forward, Barnes claimed he remembered nothing until September 13, 2008. He left the worksite in the blue flatbed pickup (the keys were in it). Although he claimed not to remember it, he stopped at Muddy Gap to buy gas. Because he did not have enough cash to pay the $135.00 fuel bill, he sold the shotgun from Jarrard's RV for $35.00 to a man named Ron Stoltenberg (Barnes apparently had a hundred dollar bill on him). The date of this event is not identified in the record (Stoltenberg was not asked what date it occurred). Stoltenberg later pawned the shotgun in Casper, and it was located there and included in the evidence in this trial.

[¶ 7] On September 12, 2008, just after 3:00 p.m., Barnes was arrested for speeding (about 93 mph) on I–80 just east of Laramie. He was driving from east to west toward Laramie. Once Barnes was stopped after a brief chase, the State Trooper assessed that Barnes was very drunk and he was arrested. Barnes was questioned but he could remember virtually nothing of what he had done since late in the day on September 11th.

[¶ 8] Of significance to the issues in this appeal, Barnes complained bitterly about the performance of his attorney and asked the district court for relief in the form of a new attorney. Also, Barnes testified in his own behalf, and the principal thread of his testimony was that he remembered nothing from the time he became intoxicated on September 11th, until September 13th, when he woke up in the Albany County Detention Center. During cross-examination, the prosecutor asked Barnes six times if witnesses were lying or mistaken when they did not agree with his testimony. In closing, the prosecutor described Barnes' defense as the "CRS defense" ("I can't remember sh*t"). In his rebuttal closing argument, the prosecutor also spoke of Barnes' apparent contention that other witnesses were "lying." We will fill in some gaps in this brief synopsis of the facts in our discussion, but the foregoing information provides adequate context for our remaining discussion.

## Prosecutorial misconduct

[¶ 9] In *Proffit v. State*, 2008 WY 114, ¶ 15, 193 P.3d 228, 235–36 (Wyo.2008) we held:

... [W]e quote at length our holding in *Jensen v. State*, 2005 WY 85, ¶ 20, 116 P.3d 1088, 1095–96 (Wyo.2005):

Turning to the prosecutor's cross-examination of Jensen, we note, generally, that a defendant who testifies in a criminal case may be cross-examined regarding his credibility just like any other witness. *Gist v. State*, 766 P.2d 1149, 1152–53 (Wyo.1988); *MacLaird v. State*, 718 P.2d 41, 47 (Wyo.1986); *Porter v. State*, 440 P.2d 249, 250 (Wyo.1968). In *Beaugureau* [*v. State*, 2002 WY 160, 56 P.3d 626 (Wyo.2002) ], however, we observed that there was a limit to the cross-examination of a criminal defendant:

Nonetheless, it is likewise error and misconduct for the prosecutor to cross-examine a defendant using the "lying" or "mistaken" technique (i.e., well, then if "so-and-so" said "such-and-such," was he "mistaken" or "lying?"). Such questions are improper. If the prosecutor merely asked Beaugureau about what other witnesses had to say, allowing the jury to draw its own conclusions, the cross-examination would not have been objectionable. *State v. Diggs*, 272 Kan. 349, 34 P.3d 63, 72–73 (2001); *State v. Manning*, 270 Kan. 674, 19 P.3d 84, 100–3 (2001) ("Questions which compel a defendant or witness to comment on the credibility of another witness are improper. It is the province of the jury to weigh

the credibility of the witnesses." (collecting cases)); *State v. Stevenson*, 70 Conn. App. 29, 797 A.2d 1, 7–9 (2002) (Such questions are improper because they "require a defendant to comment on another witness' veracity ... invade the province of the jury, create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the other witnesses lied, and distort the state's burden of proof.") (relying on *State v. Singh*, 259 Conn. 693, 793 A.2d 226, 234–39 (2002)) (collecting cases); also see *State v. Walden*, 69 Wash.App. 183, 847 P.2d 956, 959 (1993); and *State v. Pitts*, No. 47488–0–1, 2001 WL 1641225 at *4 (Wash.App. Div. 1, Dec.24, 2001) (per curiam) (use of word "lying" is misconduct; use of word "mistaken" merely objectionable).

*Beaugureau*, ¶ 17. The reasoning for prohibiting this type of questioning was succinctly summarized by the Iowa Supreme Court:

[A] defendant who is asked whether another person lied is commenting directly on the other person's credibility.

The issue then is whether any purpose is served in asking a defendant whether another witness is lying. We think the predominant, if not sole, purpose of such questioning is simply to make the defendant look bad, as implied by the Maryland court's observation in [*Fisher v. State*, 128 Md.App. 79, 736 A.2d 1125, 1163 (1999) ] that the accused's answer is unimportant. * * * The accused's answer is unimportant because the accused is in a no-win situation. If the defendant says the other witness is lying, then the defendant is put in the position of calling someone a liar, a particularly unenviable state when the other witness is a law enforcement officer. See [*State v. Emmett*, 839 P.2d 781, 787 (Utah 1992) ] (holding such questions are improper because they put "the defendant in the untenable position of commenting on the character and motivations of another witness who may appear sympathetic to the jury"). If the defendant says a contradictory witness is not lying, then a

fair inference is that the defendant is lying.

But, as any trial lawyer knows, there may be many explanations for differing descriptions of the same event. People have different perceptions of the same conversation that affect how and what they remember. Perhaps there was a misunderstanding of what was said; perhaps one person was distracted and did not fully or correctly hear the words uttered by the other person. People sometimes hear what they want to hear. It is unjust to make the defendant give an opinion as to who is lying when, in fact, it is possible that neither witness has deliberately misrepresented the truth. It is also unreasonable to expect the defendant to sift through the variables of human communication to offer an alternative explanation for contradictions in witnesses testimony.

We also think the use of this tactic—asking the defendant whether another witness is lying—is incompatible with the duties of a prosecutor. Unfairly questioning the defendant simply to make the defendant look bad in front of the jury regardless of the answer given is not consistent with the prosecutor's primary obligation to seek justice, not simply a conviction. Nor is such questioning consistent with the prosecutor's duty to the defendant to ensure a fair trial, including a verdict that rests on the evidence and not on passion or prejudice. [*State v. Casteneda–Perez*, 61 Wash.App. 354, 810 P.2d 74, 79 (Wash. Ct.App.1991) ] (holding prosecutor's questions asking witnesses whether other witnesses were lying was "contrary to the duty of prosecutors, which is to seek convictions based only on probative evidence and sound reason").

*State v. Graves*, 668 N.W.2d 860, 872–73 (Iowa 2003) (emphasis in original) (footnotes omitted).

The admonition against asking the appellant whether other witnesses lied applies equally to asking any witness whether another witness has lied. *State v. Manning*, 270 Kan. 674, 19 P.3d 84, 100–

01 (2001). That is because such questions invade the province of the jury to determine witness credibility. *Id.* The State clearly violated an unambiguous rule of law by asking both the appellant and Dr. Rogers whether other witnesses had lied. The violation was more egregious during the cross-examination of the appellant, where there were many such questions.

[¶ 10] In the *Proffit* case we reversed the defendant's convictions on eight counts of third-degree sexual assault, in part based on the immediate issue, in part on ineffective assistance of counsel, as well as many other contributing trial errors. In *Jensen v. State,* 2005 WY 85, 116 P.3d 1088 (Wyo.2005), we found a similar line of questioning to be harmless error and affirmed the convictions at issue in that case.

[¶ 11] More recently, in *Schreibvogel v. State,* 2010 WY 45, ¶¶ 41–43, 228 P.3d 874, 888 (Wyo.2010) we opined:

"Although a defendant who testifies in a criminal case may be cross-examined regarding his credibility just like any other witness, there are limits placed upon the prosecutor." *Talley [v. State,* 2007 WY 37], ¶ 10, 153 P.3d at 260. A witness may not comment on the truthfulness or veracity of another witness. *Huff v. State,* 992 P.2d 1071, 1079 (Wyo.1999). It is the jury's duty to resolve factual issues, judge the credibility of the witnesses, and determine the guilt or innocence of a criminal defendant. *Gayler v. State,* 957 P.2d 855, 860 (Wyo.1998). It is error and misconduct for a prosecutor to ask a witness whether he thinks other witnesses are "lying" or "mistaken." *Proffit v. State,* 2008 WY 114, ¶ 15, 193 P.3d 228, 235 (Wyo. 2008), citing *Beaugureau v. State,* 2002 WY 160, ¶ 17, 56 P.3d 626, 635–36 (Wyo. 2002).

The State concedes that the questions by the prosecutor violated a clear and unequivocal rule of law. It asserts, however, that Mr. Schreibvogel cannot establish that the misconduct resulted in unfair prejudice. To determine whether unfair prejudice from prosecutorial misconduct has occurred this Court balances several factors: "1) the severity and pervasiveness of the misconduct; 2) the significance of the misconduct to the central issues in the case; 3) the strength of the State's evidence; 4) the use of cautionary instructions or other curative measures; and 5) the extent to which the defense invited the misconduct." *Talley,* ¶ 16, 153 P.3d at 262. When we apply these factors to the challenged testimony, we are unable to find unfair prejudice.

Although Mr. Schreibvogel testified and his credibility was at issue, we cannot say that he "invited the misconduct." However, the misconduct here was not severe or pervasive. The questioning, while improper, was brief and the prosecution did not draw attention to Mr. Schreibvogel's answers during closing argument. The questions centered, not on the main issue of consent, but on the number of times Mr. Schreibvogel asked D.C. to go back to the salon and how he financed the fishing trip. Mr. Schreibvogel did not request a cautionary instruction or other curative measure. In closing argument, the prosecution reiterated that it was up to the jury to determine the credibility of the witnesses. After reviewing the entire record, we cannot conclude that had the prosecutor not employed the "were-they-lying" technique, a reasonable possibility exists that the verdict would have been more favorable to Mr. Schreibvogel.

[¶ 12] We deem it useful to include here a portion of a specially concurring opinion authored by Justice Voigt (then Chief Justice) in the *Schreibvogel* case:

I concur in the result reached by the majority because *stare decisis* requires us to place upon the appellant the impossible task of proving prejudice in cases such as this. The majority states the well-established law in Wyoming: "It is error and misconduct for a prosecutor to ask a witness whether he thinks other witnesses are 'lying' or 'mistaken.'" See *Proffit v. State,* 2008 WY 114, ¶ 15, 193 P.3d 228, 235 (Wyo. 2008); *Teniente v. State,* 2007 WY 165, ¶ 51, 169 P.3d 512, 528–29 (Wyo.2007); *Talley v. State,* 2007 WY 37, ¶¶ 10–11, 153 P.3d 256, 260 (Wyo.2007); *Jensen v. State,* 2005 WY 85, ¶ 20, 116 P.3d 1088, 1096

(Wyo.2005); and *Beaugureau v. State,* 2002 WY 160, ¶ 17, 56 P.3d 626, 635–36 (Wyo.2002). Yet the prosecutor in this case asked the appellant *not once, but three times,* whether another witness—the bartender, the victim, and the cellmate—was incorrect or mistaken. Perhaps the State would pay attention to the law if it bore the burden of proof as to the lack of prejudice.

. . . .

My concern is that, while the harmless error rule certainly makes sense as a reasonable systemic tool, its actual application via a process that requires each appellant to prove that he or she has been prejudiced by prosecutorial misconduct, leaves the State nearly unfettered in its ability to do as it pleases, this Court's opinions to the contrary notwithstanding.

*Schreibvogel,* ¶¶ 52, 54, 228 P.3d at 890–91 (emphasis added).

[¶ 13]  In this case, the prosecutor repeated the error six times and intimated it many more:

Q.  Well, Mr. Jarrard has testified that you were told that you were not allowed in his motor home and that he locked it up. Do you recall that?

A.  I recall him saying that here, yes, sir.

Q.  But you don't have any recollection. Apparently you were remembering things on September 9th, but you are saying your memory has been wiped out since then?

A.  Mr. Jarrard never told me that then.

Q.  *So he is not telling the truth?*

A.  I am not going to say—well, he did not tell me that on the 9th, when we discussed what I was going to do and where I was going to stay.

Q.  Were the keys in the motor home?

A.  No.

Q.  How were you able to watch television there?

A.  The door was open.  The motor home was open.

. . .

Q.  You know you were seen by the people at the hospital in Laramie?

A.  I know I have been told that.  But I don't remember that.

Q.  *Do you think Mr. Soltenberg is mistaken if he thinks you were not intoxicated or drugged up [at Muddy Gap]?*

A.  I have no opinion on why he said what he says.  I just don't remember it.

. . .

Q.  Were you able to work while you were at Mr. Jarrard's?

A.  I did.  I did the task that he assigned to me to do.

Q.  Well, he said you didn't.  He said you did not finish it?

A.  Yeah, I did and it took me two days and the use of his front-end loader on his tractor to get it done.

Q.  So with all of the medications and all of the alcohol you were still able to get the work done?

A.  Yes.

Q.  And you were still remembering back then?

A.  Yes.

Q.  You told Mr. Jarrard back when you were remembering that you had no job and that you were broke?

A.  No sir.  That is not what I told him.

Q.  You did not tell him that?  You told him I have twelve hundred dollars in my pocket and I am on my way home.  I am not broke and I don't need a job?

A.  No, that is not what I told him.

Q.  *So he is mistaken?*

A.  Apparently, yes.

Q.  And it is your testimony again that the door was not locked on the motor home and you were given permission to use the restroom in his camper?

A.  Yes, sir.

Q.  *And if he says that is not true, he is not telling the truth?*

A.  I know what he said to me.  If he says different, I don't know how to say it, but yes, I would say yes.

Q.  Well, he said he locked up the motor home and told you to stay out of there and locked it and took the keys?

A.  No sir.

Q. *So he is lying?*

A. I am not going to say that.

Q. *So he is mistaken or has forgotten?*

A. Mistaken, yes.

[¶ 14] In her argument to the jury, Barnes' defense attorney contended that the case was not about whether Mr. Jarrard was lying, or whether Barnes lying. A careful examination of the record establishes that to be the case. Barnes' defense did not depend on establishing that Jarrard told lies, he defended on the basis that he was in a drug/alcohol induced blackout when he left Jarrard's ranch and was still in it when he was arrested (that time period appears to be less than 24 hours). However, in response to the defense's closing argument, the prosecutor made these comments pertinent to this issue:

> ... [Defense attorney] said this is not Jarrard versus Barnes. She is right. Mr. Jarrard is a victim and the way the system works is the State brings the charges, not Mr. Jarrard. And it is not a civil case. But there is something to be said about they can't both be telling the truth. She said, did he leave the motor home open? He said he did not. He made it most specific that he locked it and he did not want him in the vehicles and he told him that. He was very specific that he left him enough food. And there are other things. They can't both be telling the truth. So either Mr. Barnes was lying when he said

it was open and I had access to it, or Mr. Jarrard was lying.

The problem with Mr. Barnes, if he is going lie about that, and he has to lie about that to say why he has all of the things from Mr. Jarrard's motor home, if he is going to lie about that, if he is not credible on that, if he is lying about that, you can reasonably conclude he is not telling the truth and lying about the rest.

[¶ 15] Barnes was the only witness called in the defense portion of the case. Given that his defense rested entirely on his own testimony, we conclude that the questioning methodology used by the prosecutor was prejudicial under the facts and circumstances of this case, and we reverse his conviction on that basis. For this reason it is unnecessary for us to further consider the ineffective assistance of counsel issue.

## CONCLUSION

[¶ 16] Based upon the prosecutor's misconduct, we reverse the Judgment and Sentence of the district court and remand this matter to the district court.