# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 73

### APRIL TERM, A.D. 2020

#### June 11, 2020

BRADLEY ROSS FAIRBOURN,

Appellant
(Defendant),

v.

THE STATE OF WYOMING,

Appellee
(Plaintiff).

S-18-0259, S-19-0217

*Appeal from the District Court of Sweetwater County*
*The Honorable Richard L. Lavery, Judge*

*Representing Appellant:*
> Jason M. Tangeman, Nicholas & Tangeman, LLC, Laramie, Wyoming. Argument by Mr. Tangeman.

*Representing Appellee:*
> Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Catherine Maeve Mercer, Assistant Attorney General. Argument by Ms. Mercer.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    On February 15, 2018, a jury found Bradley Fairbourn guilty on one count of Murder in the First Degree and one count of Attempted Murder in the First Degree. He appeals his convictions claiming he was denied a fair trial due to ineffective assistance of counsel and prosecutorial misconduct. He also asserts a violation of his right to a speedy trial. We affirm.

## ISSUES

[¶2]    The issues are:

1. Was Mr. Fairbourn denied his statutory or constitutional right to a speedy trial?

2. Was Mr. Fairbourn denied his constitutional right to effective assistance of counsel?

3. Was Mr. Fairbourn denied his constitutional right to due process of law and a fair trial due to prosecutorial misconduct?

## FACTS

### A.    The Crime

[¶3]    The events leading to Mr. Fairbourn's arrest and convictions culminated in the early morning hours of June 23, 2016. Naisha Story was dead, and Natalia Arce was severely injured. A few days before June 23, Ms. Arce and her boyfriend, Christopher Crayton, drove with Ms. Story, her boyfriend Paul Lovato, and their seven-month-old daughter from Salt Lake City, Utah, to Rock Springs, Wyoming. They rented two hotel rooms, Room 119 at the Quality Inn and Room 315 at a nearby hotel. The group stayed in Room 315 while Room 119 provided a location for Ms. Story and Ms. Arce to conduct a body massage business. They advertised their business and set up appointments via the internet.

[¶4]    On June 22, 2016, Mr. Fairbourn was returning home to Draper, Utah, from Denver, Colorado. En route, he stopped and rented a room in Rawlins, Wyoming. While there, he discovered an online advertisement promoting a "2 girls" special. At 9:54 p.m., he texted the number in the advertisement asking, "is the 'special' still available?" About ten minutes later, he received a response, "Yes honey 300 for one hour 2 girls." The next texts indicate Mr. Fairbourn was having trouble with his phone, but by 11 p.m. he texted,

1

"If I was there in less than two hours with cash would you still be available?" After receiving a positive response, Mr. Fairbourn drove to Rock Springs. In texts exchanged while he was driving, he was told to go to the Quality Inn, and he would receive the room number for the services when he arrived. At 1:02 a.m., he sent, "I'm pulling in now." The response at 1:04 a.m. stated, "119." At 1:16 a.m. he replied, "On my way to your room."

[¶5] When Mr. Fairbourn showed up at the room, he appeared nervous, said he had never done this before, and he wanted to know if the women had any security in the room. When he was told, "It's just [us]," Mr. Fairbourn said he needed to get money from the car and left for five to ten minutes. When he returned, Ms. Arce opened the door and Ms. Story was standing near the bathroom. Mr. Fairbourn entered and immediately stabbed Ms. Arce in the chest. He attempted to stab her eye, but she grabbed for the knife and sliced her fingers. Ms. Story began screaming and, as Mr. Fairbourn turned to attack to her, Ms. Arce ran out of the room to the street. She used her cell phone to call Mr. Crayton, who was with Mr. Lovato at the other hotel. She told Mr. Crayton she had been stabbed.

[¶6] Mr. Crayton immediately drove to the Quality Inn where he found Ms. Arce running towards the street. She got into the car and told him what had happened. Mr. Crayton drove to the lobby and told her to go in and call 911. He was on his way to Room 119 to check on Ms. Story when he saw a man (Mr. Fairbourn) running down the street. He cut him off, got out of the car, and started to beat him to prevent him from leaving. Another car drove up and both Mr. Fairbourn and Mr. Crayton told the driver to call 911. Mr. Crayton was with Mr. Fairbourn until the police arrived. Mr. Crayton then tried to make his way to Room 119. Officers stopped him a few doors away and told him to stay back. He talked with officers on the scene and, after Ms. Arce was transferred to the hospital, went to the police station for questioning.

[¶7] Geoffrey Fudurich, a guest in Room 120, recalled a woman's screams woke him around 1:15 a.m. He heard a woman repeatedly screaming "please, no" and "I have a daughter." He tried to call the hotel lobby but received no answer. His girlfriend then dialed 911. He next heard a woman outside his room asking for help. At the direction of the 911 dispatcher, he stayed in his room and, through the door, told the woman that police were on their way.

[¶8] George and Barbara Moss were staying in Room 121. Mr. Moss was awakened between 1:15 and 1:30 a.m. by a woman (Ms. Story) pounding on their room window and yelling, "help me, help me." He looked out and saw she was covered in blood. He called 911. After making the call, Mrs. Moss stepped out of the room to help Ms. Story while Mr. Moss ran to the lobby to get assistance. When he arrived, he saw another injured woman (Ms. Arce) in the hotel office. When the police arrived, he led them to Ms. Story.

[¶9]   Mrs. Moss recounted her efforts to help Ms. Story and the conversation they shared.  Ms. Story told Mrs. Moss that her seven-month-old baby and her boyfriend were in Room 315.  When Mrs. Moss asked her if her boyfriend did this, she said no.

[¶10]  Ms. Arce, Ms. Story, and Mr. Fairbourn were taken to the Memorial Hospital of Sweetwater County.  Ms. Story arrived unconscious, with multiple stab wounds and internal bleeding.  Ms. Arce arrived conscious but "clearly in a lot of shock."  She had a serious chest wound.  She was unable to open or close her damaged hand.  Medical personnel wanted to transfer the women to a trauma hospital as soon as possible.  Mr. Fairbourn presented with swelling and bruising to his face, but he was released to law enforcement officials as he had no life-threatening injury.

## B.      The Investigation

[¶11]  Detective Amanda Salazar arrived at the hospital at approximately 3:15 a.m.  She immediately took photographs of Ms. Arce and Ms. Story while they were being stabilized for a life-flight to Salt Lake City, Utah.  Ms. Story died before she could be transferred.  Detective Salazar also talked to Mr. Fairbourn.  He kept repeating he was hit by a car and assaulted.  He told her he was not staying in Rock Springs but had stopped on his way to Utah, because he "needed something to wet [his] throat."  He said he had parked his car by the Quality Inn because he wanted to stretch his legs.  While he was out of his car, without warning, another car came directly toward him, hit him, and then a man got out of the car and started beating him.  Officers collected evidence from Mr. Fairbourn, including his jeans and t-shirt.  The pockets of his jeans contained a wallet, two cell phones, and other miscellaneous items.

[¶12]  Detective Salazar had taken a picture of Mr. Fairbourn which she showed to Ms. Arce, saying "this may or may not be the [guy]."  Ms. Arce asked if he was wearing a red shirt.  After Detective Salazar said "yes," Ms. Arce looked at the photograph and said, "that's the guy."

[¶13]  Mr. Fairbourn was taken to the police department at 9:45 a.m.  After reading him his rights, Detective Salazar continued to question him.  Mr. Fairbourn repeated his previous account of the night's events but added he had rented a room in Rawlins for the night.  He explained that when he could not sleep, he decided to continue to Utah and left Rawlins.  He stopped in Rock Springs and walked into McDonald's.  He realized he did not have any money, tried to use his card, and left when it was declined.  He was headed back to his car when a white Chrysler turned on its lights and came at him.  As he tried to get away, the car hit him, knocking him into a wall.  A man (Mr. Crayton) exited the car and started hitting and kicking him.  Mr. Fairbourn asked, "what did I do?" and the man responded, "you know what you did."  Mr. Fairbourn told Detective Salazar he had "no idea what's going on."

3

[¶14]  Detective Salazar challenged this story.  She told him, "the lobby at McDonald's closes at 11 o'clock, so you didn't go to the McDonald's to try to get a drink."  Mr. Fairbourn responded,

> Like I said, I walked over there, tried to open the door.  I don't remember it being closed.  I really don't.  I'm so out of it still, so I thought I went in.  I really did think I went in.  And then I tried to find an ATM or a gas station.

Detective Salazar then said, "Brad, tell me about meeting [the] girls."  At first, Mr. Fairbourn insisted he did not know what she meant.  Mr. Fairbourn maintained, "I didn't meet anyone.  I was trying to get to McDonald's.  I swear to you.  I'm still really confused. . . . [I] [d]idn't even go towards the Quality Inn.  I was walking the other direction."  At that point, Detective Salazar told him, "[t]wo girls got stabbed last night at the Quality Inn."  Mr. Fairbourn continued to insist he had told her everything.  Detective Salazar then told Mr. Fairbourn she had accessed the victims' cell phone accounts and had seen the conversations.  (She had not done so at that point.)  Mr. Fairbourn's story shifted:

> I went down there.  I had no money and left.  That was what happened. . . . So here's the honest to God truth.  I found them [online], sent them a message, and they replied almost immediately. . . . And as I was driving down, I realized I had no money.  I had just bought that hotel room and filled up my truck, so I had no money. . . . I don't even think I went to the room.  I started walking there, pulled out my wallet and realized I had nothing and turned around and started to leave, and then I got hit by the car. . . . So that's what really happened.

[¶15]  Mr. Fairbourn repeated he never had the room number and never met the girls.  Shortly thereafter, he said, "I think maybe I need a lawyer," and the interview ended.  Mr. Fairbourn was charged and transported to the jail, where he remained until trial.

[¶16]  Meanwhile, at the Quality Inn, officers from the Rock Springs Police Department secured the scene and interviewed other hotel guests.  The officers took photographs and DNA swabs from the scene.  They also took DNA swabs from the victims' clothing and from the clothing of Mr. Fairbourn and Mr. Crayton.  Additionally, officers took DNA samples from Mr. Fairbourn, Mr. Crayton, and Ms. Story.  Ms. Arce supplied a DNA sample on request in late November 2016.

[¶17]  Officers procured search warrants for Ms. Arce's cell phone and the cell phones found in Mr. Fairbourn's pocket.  Ms. Arce's and Mr. Fairbourn's cell phones contained

the messages sent and received between them while Mr. Fairbourn traveled to Rock Springs. The second cell phone in Mr. Fairbourn's pocket belonged to Ms. Story.

[¶18] Officers investigated the surrounding area. The JFC Engineers & Surveyors building was located near the Quality Inn. At the next-door business, Smyth Printing, a one-story building, they found a knife and a scabbard toward the front and center of the roof. These were photographed and collected. When Richard Meeks, the IT manager at JFC Engineers & Surveyors, arrived at work on June 23, 2016, he provided officers video footage from the business surveillance camera. This video showed Mr. Fairbourn walking up to the building around 1:22 a.m. from the direction of Smyth Printing.

[¶19] The Wyoming State Crime Lab (Crime Lab) conducted an initial DNA test of the knife handle in November 2016. The test was inconclusive for Mr. Fairbourn's DNA due to the complexity of testing a sample containing blood from more than one person. A later DNA test was run using a technique suited for such samples. This later testing technique only became available to the Crime Lab in January 2017. The later test on the samples from the knife *blade* identified the DNA profiles of Ms. Arce and Ms. Story. The DNA profiles on the samples from the knife *handle* were those of Mr. Fairbourn and Ms. Arce.

## C.    The Trial

[¶20] Mr. Fairbourn's trial began on February 7, 2018. The State presented the testimony of Quality Inn guests: Mr. Fudurich, Mr. Moss, and Mrs. Moss. Lori Keelin, the night auditor at the Quality Inn, related the events that occurred in the hotel lobby. Ms. Arce, Mr. Crayton, and Mr. Lovato also testified. In addition, numerous law enforcement officers explained their part in various investigative activities.

[¶21] This testimony was accompanied by photographs and body camera videos from several officers at the scene of the crime. The jury also saw the surveillance video from JFC Engineers and the recorded videos of Mr. Fairbourn's interviews at the hospital and the police station.

[¶22] The jury heard a recording of a telephone call between Mr. Fairbourn and a relative while Mr. Fairbourn was in jail. The telephone call was recorded after the State disclosed the presence of Ms. Arce's and Mr. Fairbourn's DNA on the knife handle. Mr. Fairbourn and the caller discussed the test results. Mr. Fairbourn told the caller the defense would explain the presence of his DNA "by the fact that I shook the hand of . . . the other person that's on there . . . . [I]t was Arce that was on there." After further discussion, the other person on the call said, "No, I totally forgot you met the bitches, and they wanted more money. I totally forgot that." It was from this conversation that the State first learned that Mr. Fairbourn *admitted* he went to Room 119 and met with the victims.

5

[¶23]  Medical professionals testified to the location and severity of the victims' wounds and, in Ms. Story's case, the cause of death.  The State called two expert forensic analysts.  The first, Jennifer Brammeier, explained the manual DNA test results from the analysis performed in November 2016, prior to receiving a DNA sample from Ms. Arce. The second, Christina Buettner, testified she performed a second analysis in March 2017 using a new technique, and she included Ms. Arce's DNA sample in addition to the samples from Ms. Story, Mr. Crayton, and Mr. Fairbourn.

[¶24]  Ms. Brammeier testified that on November 29, 2016, she conducted the initial serology and DNA tests.  She tested four cutouts from Mr. Fairbourn's t-shirt, three cutouts from Mr. Fairbourn's jeans, four swabs from the knife blade, and two swabs from the knife handle.  She detected human blood on the t-shirt, jeans, and the knife blade and the possible presence of blood on the knife handle.  A presumptive chemical test indicated additional areas of possible blood on the t-shirt and jeans.  Ms. Brammeier conducted a manual DNA analysis which established a profile of the blood on the jeans and t-shirt consistent with Mr. Fairbourn's DNA.[1]  The profile from one cutout of Mr. Fairbourn's jeans showed a DNA mixture from which Ms. Story could not be excluded, and another profile from a separate jeans cutout was also consistent with Ms. Story's DNA.  Swabs from the knife blade showed a mixture of DNA consistent with Ms. Story and another unidentified individual or individuals.  The DNA profile from the knife handle contained a mixture of blood, and while the results were inconclusive, Ms. Story and Mr. Fairbourn could not be excluded.  At the time of these tests, Ms. Arce's samples had not been received and the new technique was not available.[2]

[¶25]  Ms. Buettner, the DNA technical leader at the Crime Lab, testified regarding the validation procedures used to prepare DNA testing and the methods used to prevent contamination of samples.  She explained the Crime Lab started using a new testing technique, called STRmix, in January 2017.  Manual testing, which was used during the November DNA tests, could not be statistically valid for three-person mixtures of DNA. The manual test results would have required a finding of "inconclusive."

[¶26]  Ms. Buettner reran DNA profiles using the STRmix technique and with the benefit of Ms. Arce's samples.  She issued her report on March 30, 2017.  The DNA on the cutout from Mr. Fairbourn's jeans contained a ninety-two percent contribution from Ms. Story with the remainder from another individual who may have been Mr. Fairbourn.

---

[1] "Profiles are declared to be <u>consistent</u> when no conflicting allele designations can be discerned.  Profiles are declared to be <u>not consistent</u> when genetic comparisons show differences that can only be explained by the samples originating from different sources."

[2] Ms. Arce's samples were provided shortly thereafter.

The DNA on the knife blade had contributions from Ms. Arce and Ms. Story, and the DNA on the knife handle contained contributions from Mr. Fairbourn and Ms. Arce.

[¶27]  Commander Clark Robinson, a blood spatter expert and the Rock Springs Police Department Division Commander, testified that he was not surprised at the relatively sparse amount of blood on Mr. Fairbourn because many of Ms. Story's wounds were in places covered by her hair or clothing.  He testified, where the attacker is much taller than the victim, blood would be more likely to be lower to the ground and on the attacker's pants or shoes.  Here Mr. Fairbourn was significantly taller than the victims.

[¶28]  During cross-examination, defense counsel engaged in the following colloquy with Commander Robinson:

> Q.     . . . [Y]ou don't know who did this, do you?
>
> A.     I do believe I do know.
>
> .   .   .
>
> Q.     I'm asking you if you have any evidence who did this?
>
> A.     Beyond the statements of the witnesses that saw him do it and the blood on him and the knife and his DNA?

The trial then recessed for the day.

[¶29]  At the close of the State's case, the defense moved for a judgment of acquittal.  The district court denied the motion and the defense presented its case.  Dr. Greg Hampikian testified as Mr. Fairbourn's DNA expert.  Dr. Hampikian presented a PowerPoint explaining DNA analysis and the difficulties in determining complex (more than one contributor) DNA samples.[3]  He also explained DNA transfer and the ease with which it can be transferred from one object to another.

[¶30]  The defense called three more witnesses: Robert Mizel, an investigator for the Sweetwater County and Prosecuting Attorney's Office, who had interviewed Ms. Arce in Salt Lake City; Rock Springs Police Department Sergeant Travis Moser, who had interviewed Quality Inn guests on the morning of June 23, 2016; and Mr. Fairbourn.  The defense sought to introduce reports made by Mr. Mizel and Sergeant Moser.  These reports contained statements by witnesses who were not called at trial.  If the reports

---

[3] Dr. Hampikian was allowed to testify during the State's presentation of evidence due to scheduling complications.

could be successfully introduced, the defense could present the substance of the statements without calling the witnesses themselves. The district court allowed the defense to question Mr. Mizel and Sergeant Moser in an offer of proof. The district court ruled:

> [W]ith respect to the report of Sergeant Moser, this report has so much information, so much hearsay in it, apart from the statements [the defense seeks to introduce], and we heard today and in the courtroom that Sergeant Moser was simply called out to do what he did to interview people and make a report, and he didn't do anything else, . . . that report is excluded.
>
> You can talk to him about the fact of what he did in the case and what he did with the report, but the hearsay information inside of this report is not admissible.
>
> With respect to the specific report of County Attorney's Office Investigator Mizel, the report itself, again, prepared by Officer Mizel is not admissible, however, you can ask him about those two statements that are highlighted in your exhibit that you presented to the Court, but beyond that, you may not talk about the report or get into any more detail contained in that report. Is everyone clear?

[¶31] Mr. Fairbourn was the final witness. He admitted he lied to police investigators but said he did so because he feared he would be arrested for soliciting. He admitted he went to Room 119. He testified he went in, shut the door, and shook the women's hands. They told him, "if you'll put the donation on the table, we can get started." He became very nervous and thought he might be robbed, so he left, intending to drive home to Utah. Before getting in his car, he walked toward McDonald's, realized it was closed, and started to return to his vehicle. He recounted getting hit by Mr. Crayton's car and the subsequent assault. Mr. Fairbourn said he did not understand what was happening at the time. He described his experience at the police station and insisted he did not stab Ms. Story or Ms. Arce.

[¶32] On cross-examination, Mr. Fairbourn admitted he did not have $300 in cash when he left Rawlins but said he intended to go to an ATM. He later testified he knew he did not have $300 available in any of his accounts. When asked about Ms. Story's cell phone found in his possession, he stated, "That's what I've been told. . . . I don't believe or disbelieve [I had two phones]. I just don't know." Mr. Fairbourn testified he did not see anyone go into the room after he left Room 119 and did not hear screaming.

8

[¶33] The jury returned guilty verdicts on Murder in the First Degree and Attempted Murder in the First Degree. The district court sentenced Mr. Fairbourn to two life sentences without the possibility of parole.

[¶34] On February 15, 2019, Mr. Fairbourn filed a W.R.A.P. 21 motion for a new trial alleging ineffective assistance of counsel. The district court heard argument and received evidence on May 8, 2019. The district court entered its Order Denying New Trial on August 14, 2019, and Mr. Fairbourn timely appealed.

## I. *Was Mr. Fairbourn denied his statutory or constitutional right to a speedy trial?*

## A. Standard of Review

[¶35] Mr. Fairbourn asserts the charges against him must be dismissed because the time elapsed between his arrest and his trial violated his right to a speedy trial under both Rule 48 of the Wyoming Rules of Criminal Procedure and the Sixth Amendment of the United States Constitution. We review claims of speedy trial violations de novo to ensure the mandates of W.R.Cr.P. 48 and constitutional guarantees are met. *Berry v. State*, 2004 WY 81, ¶ 17, 93 P.3d 222, 227–28 (Wyo. 2004) (citation omitted).

## B. Analysis

### 1. W.R.Cr.P. 48

[¶36] Mr. Fairbourn was arraigned on August 10, 2016, and trial commenced on February 7, 2018, a period of 546 days. W.R.Cr.P. 48(b)(2) requires "[a] criminal charge shall be brought to trial within 180 days following arraignment." We would normally analyze Mr. Fairbourn's speedy trial rights under W.R.Cr.P. 48 by calculating the 180-day requirement, beginning with arraignment and ending with commencement of trial, while excluding any of the time periods permitted under the rule.[4] *Ortiz v. State*, 2014

---

[4] Rule 48(b) provides:

> (3) The following periods shall be excluded in computing the time for trial:
>> (A) All proceedings related to the mental illness or deficiency of the defendant;
>> (B) Proceedings on another charge;
>> (C) The time between the dismissal and the refiling of the same charge; and
>> (D) Delay occasioned by defendant's change of counsel or application therefor.
> (4) Continuances exceeding 180 days from the date of arraignment may be granted by the trial court as follows:
>> (A) On motion of defendant supported by affidavit; or

WY 60, ¶ 33, 326 P.3d 883, 892 (Wyo. 2014) (citation omitted). In this case, however, Mr. Fairbourn filed a knowing and voluntary waiver of his right to a speedy trial on December 16, 2016—128 days after his arraignment. The "[f]iling [of] a signed waiver of speedy trial by the defendant effectively stops the clock pursuant to W.R.Cr.P. 48." *Id.* ¶ 35, 326 P.3d at 892 (citation omitted); *Mathewson v. State*, 2019 WY 36, ¶¶ 52–53, 438 P.3d 189, 208–09 (Wyo. 2019).

[¶37] Mr. Fairbourn argues his express waiver is not dispositive of the issue. W.R.Cr.P. 48(b)(5) provides: "Any criminal case not tried or continued as provided in this rule shall be dismissed 180 days after arraignment." W.R.Cr.P. 48(b)(4)(A) provides: "Continuances exceeding 180 days from the date of arraignment may be granted by the trial court as follows: (A) On motion of defendant supported by affidavit[.]" Mr. Fairbourn claims his later motions for a continuance were not accompanied by the required affidavit. In addition, he maintains the district court failed to make findings regarding the prosecution's due diligence when it granted later continuances as required by Rule 48(b)(4)(B)(ii).[5]

---

(B) On motion of the attorney for the state or the court if:
    (i)   The defendant expressly consents;
    (ii)  The state's evidence is unavailable and the prosecution has exercised due diligence; or
    (iii) Required in the due administration of justice and the defendant will not be substantially prejudiced; and
(C) If a continuance is proposed by the state or the court, the defendant shall be notified. If the defendant objects, the defendant must show in writing how the delay may prejudice the defense.
(5) Any criminal case not tried or continued as provided in this rule shall be dismissed 180 days after arraignment.
(6) If the defendant is unavailable for any proceeding at which the defendant's presence is required, the case may be continued for a reasonable time by the trial court but for no more than 180 days after the defendant is available or the case further continued as provided in this rule.

W.R.Cr.P. 48 (b)(3)–(6).

[5] Mr. Fairborn cites *United States v. Toombs*, 574 F.3d 1262, 1272 (10th Cir. 2009) in support of his argument. This case is inapplicable to our Rule 48 analysis. In *Toombs*, the Tenth Circuit found the reasons supporting several ends-of-justice continuances inadequate where the "sole explanation contained in the record for each of the continuances [was] that discovery was recently disclosed and counsel consequently needed additional time to prepare for trial." *Toombs*, 574 F.3d at 1272. The Tenth Circuit has distinguished the facts in *Toombs*, because in that case, there was no indication "—from the motions seeking continuances or from the district court's orders granting them—that the district court had considered 'the nature of the recently disclosed discovery, the relevance or importance of the discovery, or why . . . it [was] proper to grant an approximately two-month continuance.'" *United States v. Watson*, 766 F.3d 1219, 1231 (10th Cir. 2014) (citing *Toombs*, 574 F.3d at 1272). Unlike *Toombs*, and similar to *Watson*, the district court here was fully apprised of the reasons for the requested continuances.

[¶38] We do not "impose a set of specific procedural requirements to which a court must adhere in re-setting a trial date." *Castellanos v. State*, 2016 WY 11, ¶ 63, 366 P.3d 1279, 1298 (Wyo. 2016). "Our concern [is] not with the mechanics of a trial court's setting of a trial date, but rather with the court's attention to the grounds on which a trial date may be continued beyond the 180-day mark." *Id.* Mr. Fairbourn's express waiver eliminated the need for an affidavit accompanying each of his subsequent continuance requests.

[¶39] Mr. Fairbourn made no attempt to revoke or challenge the ongoing validity of his intentional waiver. He requested, stipulated to, or was notified of every continuance. Five continuances were granted in this matter. Mr. Fairbourn failed to object to any of the continuances. Relevant to our Rule 48 analysis, Mr. Fairbourn requested and was granted a continuance on December 19, 2016—three days after he entered his waiver of speedy trial—based on the volume of discovery and the desire to hire a DNA expert among other things. His next motion was heard on May 5, 2017, when Mr. Fairbourn requested a continuance as a result of the State's new DNA evidence. Defense counsel orally renewed Mr. Fairbourn's speedy trial waiver stating he was not faulting the State and he had discussed the delay with Mr. Fairbourn. He asserted Mr. Fairbourn was

> not concerned when the trial is. He just wants to be sure when the trial is held that we've done everything, all of us, to make sure that we've made the trial as fair as possible, so he has — he certainly has no objection, and he has signed a Waiver of Speedy Trial prior.

[¶40] On August 14, 2017, the parties stipulated to a mental health evaluation of Mr. Fairbourn at the Wyoming State Hospital. However, Mr. Fairbourn was not scheduled for transfer to the facility until shortly before the due date for the evaluation report. This delayed the evaluation and required another continuance. Mr. Fairbourn was notified and did not object. The final continuance, a two-day delay, was initiated by the district court. The reason is not set forth in the record, but counsel for both parties were consulted and did not object.

[¶41] Mr. Fairbourn's express waiver of his right to a speedy trial under W.R.Cr.P. 48 remained in effect throughout the proceedings. His statutory right to a speedy trial was not violated.

## 2. Constitutional Right to a Speedy Trial

[¶42] Mr. Fairbourn's claim that his constitutional right to a speedy trial was violated requires separate analysis. We apply the four-factor test set forth in *Barker v. Wingo*, 407 U.S. 514, 530–33, 92 S.Ct. 2182, 2192–93, 33 L.Ed.2d 101 (1972): "(1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant." *Ortiz*, ¶ 39, 326 P.3d at 893 (citations omitted).

We conduct this analysis to determine whether the delay in bringing the accused to trial was unreasonable, that is, whether it substantially impaired the right of the accused to a fair trial. No single factor is dispositive. Instead, we consider the factors together and balanced in relation to all relevant circumstances. The State has the burden to prove delays in bringing the defendant to trial are reasonable and necessary.

*Mathewson*, ¶ 57, 438 P.3d at 209 (internal citations and quotation marks omitted).

### a. Length of Delay

[¶43] Unlike Rule 48, where the speedy trial calculations begin at arraignment, the constitutional "speedy trial clock begins to run at the time of arrest, information, or indictment, whichever occurs *first*." *Webb v. State*, 2017 WY 108, ¶ 15, 401 P.3d 914, 921 (Wyo. 2017) (emphasis added) (citations omitted). It "continues until the defendant is convicted, acquitted or a formal entry is made on the record of his case that he is no longer under indictment." *Ortiz*, ¶ 40, 326 P.3d at 893 (citations omitted). Mr. Fairbourn was arrested June 23, 2016, and convicted on February 15, 2018. "Although [n]o precise length of delay automatically constitutes a violation of the right to a speedy trial, a delay of over 365 days presumptively triggers review of the remaining *Barker* factors." *Mathewson*, ¶ 58, 438 P.3d at 210 (citations and internal quotation marks omitted). We proceed with an examination of the remaining *Barker* factors as the time between Mr. Fairbourn's arrest and conviction was well over the presumptive trigger.

### b. Reason for Delay

[¶44] The second *Barker* factor requires us to consider the reasons for the delay and which party was responsible for the delay. *Ortiz*, ¶ 42, 326 P.3d at 893 (citation omitted). "We weigh the delays caused by the State against those caused by the defendant, keeping in mind it is the State's burden to bring a defendant to trial in a timely manner and it must show that the delays were reasonable and necessary." *Mathewson*, ¶ 59, 438 P.3d at 210 (quoting *Durkee v. State*, 2015 WY 123, ¶ 16, 357 P.3d 1106, 1112 (Wyo. 2015)). Delays caused by the defendant, "including requests for continuances, changes in defense counsel, and defendant's pretrial motions, may disentitle a defendant to speedy trial safeguards." *Id.* (citation and internal quotation marks omitted). "Any delay caused by the defendant's counsel is also charged against the defendant." *Id.* (citing *Castellanos*, ¶ 73, 366 P.3d at 1300).

[¶45] Mr. Fairbourn asserts, other than his request for a competency evaluation, the delays were attributable to the State due to its inability to timely produce discovery "or otherwise follow Court Orders." We disagree.

[¶46]  Mr. Fairbourn was arrested on June 23, 2016.  On June 29, 2016, he requested a continuance of the preliminary hearing.  This delay is attributable to him.

[¶47]  The second delay came as a result of Mr. Fairbourn's December 19, 2016 request for a continuance of the first trial date (January 17, 2017).  The cited reason for the request was: (1) the volume of discovery provided by the State; (2) "through no fault of the State," the recent receipt of DNA Lab results (from the November 29, 2016 manual test) which did not include the "Litigation Packet"; and (3) the desire to hire DNA experts to evaluate and testify at trial.  The district court granted the continuance and trial was reset for June 12, 2017.  We find this delay to be attributable equally to the State and Mr. Fairbourn.

[¶48]  The third continuance was granted in May 2017.  On May 1, 2017, the parties filed a stipulated response to the court's order for pretrial conference that each had complied with discovery and disclosure requirements and "[c]ommunication between the parties has been excellent . . . ."  At the May 5, 2017 pretrial conference, defense counsel offered, "Your Honor, . . . I would like to start out by saying . . . the Defense is not pointing any fingers at anyone."  Defense counsel then explained he had received discovery on May 1, 2017, revising the November 2016 DNA report.  The DNA samples, retested with new technology, established the DNA on the knife handle was compatible with Mr. Fairbourn and Ms. Arce.  The State had received this report sometime after March 30, 2017.

[¶49]  Defense counsel requested a continuance to allow for a *Daubert* hearing or, in the alternative, exclusion of the evidence.  Defense counsel explained:

> another option would be . . . even though it's no one's fault,
> . . . to exclude the evidence . . . .
>    The other option would be for a continuance, and that's—that's certainly what I would be asking for should this evidence be allowed in at trial. . . . Mr. Fairbourn [is] not concerned when the trial is.

The district court asked Mr. Fairbourn directly if he agreed with a continuance.  Mr. Fairbourn responded, "I think that's the only way to go, your Honor."

[¶50]  The district court ruled the evidence "was not even available until March 30th."  The court found the one-month gap from March 30 until the defense received the report did not prejudice Mr. Fairbourn.  The district court reasoned that even had the report been immediately sent to the defense team, a *Daubert* hearing would have been necessary and could not be scheduled without a continuance of the trial date.  The court vacated the existing trial date, and a new trial was set for November 6, 2017.  This five-month delay

is attributable to the State, but given Mr. Fairbourn's express consent, it does not weigh heavily in his favor.

[¶51] On August 14, 2017, the parties filed a stipulated motion for a competency evaluation of Mr. Fairbourn to be conducted at the Wyoming State Hospital. The district court ordered the evaluation and required that it be completed within thirty days. On September 13, 2017, the Wyoming State Hospital requested an additional thirty days from date of admission to complete the evaluation because Mr. Fairbourn was not scheduled to arrive at the facility until the week of October 30, 2017.[6] The record does not reflect the reason the State Hospital could not receive Mr. Fairbourn until that time. After consultation with counsel for both the State and Mr. Fairbourn, and without objection, trial was rescheduled from November 6, 2017, to February 5, 2018.

[¶52] "Where the primary reason for the delay is the determination of the defendant's mental competency to stand trial, Wyoming law requires suspension of all criminal proceedings until the district court can make a determination of the defendant's mental competency to stand trial." *Hauck v. State*, 2001 WY 119, ¶ 14, 36 P.3d 597, 601 (Wyo. 2001) (citations omitted). "Once there exists reasonable cause to question a criminal defendant's competency, due process protections of the state and federal constitutions also mandate such a suspension." *Id.* (citation omitted). Under W.R.Cr.P. 48, all proceedings related to the mental illness or deficiency of the defendant are excluded in computing the time for trial. W.R.Cr.P. 48(b)(3)(A). Mr. Fairbourn argues that only the first thirty days should be excluded because the additional delay was caused by the State Hospital, not Mr. Fairbourn. We rejected this argument in *Castellanos*, declining to attribute the delay to the State when there was no "inherent unreasonableness in the time it took the State Hospital to complete its evaluation." *Castellanos*, ¶ 84, 366 P.3d at 1302. Here, the three-month delay is neutral. Both parties requested the evaluation and both parties agreed to the extension. There is no indication the State deliberately or negligently caused the delay in scheduling.

[¶53] The final continuance was initiated by the district court. No reason is reflected in the record, but counsel for both parties were consulted and neither objected. We find this two-day rescheduling delay to be neutral.

[¶54] In sum, we assign responsibility for one of five delays—the application of a new technique for DNA testing that was unavailable prior to the time the initial tests were conducted—to the State. This delay was reasonable and necessary. The remaining delays were neutral or attributable to Mr. Fairbourn.

---

[6] The evaluation was again extended due to the State Hospital's difficulty in securing Mr. Fairbourn's medical records, but this extension did not require an additional continuance.

### c. Defendant's Assertion of His Right to Speedy Trial

[¶55] We now turn to whether Mr. Fairbourn asserted his right to a speedy trial. "Although a defendant is not required to assert his right to a speedy trial, the vigor with which the defendant asserted his right is an important consideration in determining the reasonableness of any delay." *Griggs v. State*, 2016 WY 16, ¶ 68, 367 P.3d 1108, 1130 (Wyo. 2016); *see also Ortiz*, ¶ 52, 326 P.3d at 895 ("The failure to assert the right to a speedy trial, while not necessary to prove a violation of that right, weighs heavily in determining whether that right was violated." (citations omitted)). A defendant's consistent assertion of his right weighs heavily in favor of the defendant, whereas less than vigorous assertions are given little weight. *Berry*, ¶ 45, 93 P.3d at 236; *Campbell v. State*, 999 P.2d 649, 656 (Wyo. 2000) (citation omitted).

[¶56] Mr. Fairbourn filed demands for speedy trial on August 1, 2016, and August 8, 2016. However, these demands were made before his December 16, 2016 express waiver of speedy trial right. Following his waiver, Mr. Fairbourn consistently took the position that he was not concerned with his speedy trial rights. *See supra* ¶ 49. This factor weighs against Mr. Fairbourn in the overall speedy trial analysis.

### d. Prejudice to Defendant

[¶57] The final *Barker* factor requires consideration of prejudice. To evaluate prejudice, we consider, "(1) lengthy pretrial incarceration; (2) pretrial anxiety; and, (3) impairment of the defense." *Ortiz*, ¶ 59, 326 P.3d at 896 (quoting *Berry*, ¶ 46, 93 P.3d at 237). "Pretrial anxiety 'is the least significant' factor and because a 'certain amount of pretrial anxiety naturally exists,' an appellant must demonstrate that he suffered 'extraordinary or unusual' pretrial anxiety." *Webb*, ¶ 23, 401 P.3d at 923–24 (quoting *Castellanos*, ¶ 88, 366 P.3d at 1303). We consider "[t]he impairment of defense factor" the "most serious because it impacts the defendant's ability to prepare his case and skews the fairness of the entire system." *Id.* (quoting *Castellanos*, ¶ 88, 366 P.3d at 1303). Where the defendant claims prejudice, he has the burden to demonstrate and substantiate such prejudice. *Id.* (citations omitted).

[¶58] Mr. Fairbourn was incarcerated for the 602 days between arrest and trial. He asserts his pretrial anxiety caused him to contemplate suicide and suffer severe panic attacks. The record reflects Mr. Fairbourn had mental health issues beginning in childhood, including panic attacks, severe depression, and suicidal incidents. It is reasonable to conclude these mental health problems would continue and perhaps intensify while he remained incarcerated on charges of murder and attempted murder. We find the length of the delay and Mr. Fairbourn's anxiety weigh marginally in his favor.

15

[¶59]  We now consider whether the delay prejudiced his defense.  Mr. Fairbourn posits that, given the length of time between his arrest and trial, "[p]resumably [Mr. Garcia's and Mr. Bernstein's (two witnesses not called)] memories would have faded and no longer be as helpful."  He fails to acknowledge the State provided the defense the information regarding these witnesses early in the discovery process.  Mr. Fairbourn's trial counsel made the decision to forego calling these witnesses at trial.  Speculation that *presumably* the witnesses' memories would be less helpful does not establish prejudice.  *Walters v. State*, 2004 WY 37, ¶ 14, 87 P.3d 793, 796 (Wyo. 2004) (defendant "did not show that his defense was impaired because he failed to prove that three witnesses were actually unavailable").  Should the defendant fail to demonstrate prejudice, "the other three *Barker* factors **must weigh heavily** in his favor to establish a speedy trial violation."  *Webb*, ¶ 23, 401 P.3d at 923–24 (emphasis added) (citation omitted).

### e.  Balancing of the Factors

[¶60]  The only delay we assign to the State resulted from the application of new DNA technology.  *See supra* ¶ 54.  Mr. Fairbourn waived his right to a speedy trial and then failed to raise a speedy trial objection prior to his conviction.  The length of the delay and evidence of anxiety weighed marginally in Mr. Fairbourn's favor.  Overall, we find no evidence of prejudice to Mr. Fairbourn's defense.  *See Lafferty v. State*, 2016 WY 52, ¶ 68, 374 P.3d 1244, 1255 (Wyo. 2016) (no evidence of "deliberate attempts to delay the trial in order to hamper the defense").  Balancing the *Barker* factors, we conclude Mr. Fairbourn was not denied his constitutional right to a speedy trial.

## II.  Was Mr. Fairbourn denied his constitutional right to effective assistance of counsel?

### A.  Standard of Review

[¶61]  "Ineffective assistance of counsel claims present mixed questions of law and fact that we review de novo."  *Mills v. State*, 2020 WY 14, ¶ 19, 458 P.3d 1, 9 (Wyo. 2020) (citations omitted).  "To prevail on an ineffective assistance claim, a defendant must show that his trial counsel rendered constitutionally deficient performance and that absent that deficiency, a reasonable probability exists that he would have enjoyed a more favorable verdict."  *Bittleston v. State*, 2019 WY 64, ¶ 31, 442 P.3d 1287, 1295 (Wyo. 2019) (quoting *Wall v. State*, 2019 WY 2, ¶ 39, 432 P.3d 516, 527 (Wyo. 2019)).  "We 'invoke[] a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment.'"  *Winters v. State*, 2019 WY 76, ¶ 12, 446 P.3d 191, 199 (Wyo. 2019) (alteration in original) (quoting *Schreibvogel v. State*, 2010 WY 45, ¶ 47, 228 P.3d 874, 889 (Wyo. 2010)).

[¶62]  "The failure to make the required showing of either deficient performance or prejudice will result in a finding that counsel was not ineffective."  *Weston v. State*, 2019

WY 113, ¶¶ 34–35, 451 P.3d 758, 768 (Wyo. 2019) (quoting *Osborne v. State*, 2012 WY 123, ¶ 19, 285 P.3d 248, 252 (Wyo. 2012)).  Therefore,

> [a] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*McNaughton v. State*, 2016 WY 112, ¶ 12, 384 P.3d 276, 278 (Wyo. 2016) (quoting *Sen v. State*, 2013 WY 47, ¶ 39, 301 P.3d 106, 121 (Wyo. 2013)).

## B.    Analysis

[¶63]  Mr. Fairbourn presents four arguments in support of his claim that he received ineffective assistance of counsel: (1) counsel failed to question or strike a juror that had been represented by one of the prosecuting attorneys twenty years earlier; (2) defense counsel failed to object on numerous occasions to the admission of the State's hearsay evidence; (3) defense counsel attempted "to introduce their case-in-chief via hearsay" statements; and (4) defense counsel elicited from two law enforcement witnesses their opinion of Mr. Fairbourn's guilt.  He asserts the cumulative effect of these errors was prejudicial.

[¶64]  The district court determined defense counsel's performance did not fall below the standard of care in any instance.  It further concluded, "Even if some of [counsel's] actions fell below the standard of care], there was no prejudice as the electronic, physical, and forensic evidence was overwhelming."  We agree.

[¶65]  The first claim Mr. Fairbourn asserts is defense counsel's failure to strike a prospective juror, who later became the jury foreman.  In response to the prosecutor's question of whether anyone knew him, the prospective juror responded, "You were a lawyer for [me] years and years ago, a case that had nothing to do with this one."  When asked if "that [was] going to have any impact on [his] decisions in this case," the prospective juror said, "No."

[¶66]  The prospective juror was seated.  At the Rule 21 motion hearing he testified that the prosecutor represented him regarding an alcohol-related charge when the juror was under twenty-one (he was thirty-eight at the time of Mr. Fairbourn's trial).  The juror could not recall the facts of the case, stating he was "pretty sure [he] had a fine to pay, and that's about the extent of what [he] remember[ed] about it."  The juror testified he did not have any reservations about sitting on the jury and his focus was on the case, not the lawyer.  Despite the juror's testimony, Mr. Fairbourn argues we should apply a

presumption of bias due to the "built-in trust" arising from the prior attorney-client relationship. He does not, however, explain how the absence of this juror would have resulted in a different outcome, given the physical and testimonial evidence presented, which we discuss below.

[¶67] Mr. Fairbourn next argues that the videos from Officer Henderson's body camera, admitted without objection, allowed the jury to hear impermissible and prejudicial hearsay statements from Mr. Crayton. When Officer Henderson arrived at the Quality Inn, he was directed to where Ms. Story lay on the sidewalk being attended to by other officers. His body camera recorded conversations of multiple people, including Mr. Crayton. The officers asked Mr. Crayton if he could identify the woman on the ground. Mr. Crayton responded, "She's here with us."

| [Officer]: | Who is us? Who did this? |
|---|---|
| [Mr. Crayton]: | This guy over here did this. |
| [Officer]: | The guy laying down over there? |
| [Mr. Crayton]: | Yeah. |
| [Officer]: | What did he do? |
| [Mr. Crayton]: | [calling Mr. Lovato] Can you charge me to Room 315, please. |
| [Officer]: | Okay. I need you to look at me. We've got to find who did this. |
| [Mr. Crayton]: | This is him over here. The girl got stabbed-- |
| [Officer]: | This girl? |
| [Mr. Crayton]: | No, not this one. The other girl. My girlfriend . . . called me and said some dude just stabbed [her]. |
| [Officer]: | Okay. |

.    .    .

| [Officer 2]: | Did she see what he looked like? |

18

| [Officer]: | He's saying it's the guy that's down over here. |
| --- | --- |
| [Mr. Crayton]: | Red shirt, white dude. |
| [Officer 2]: | [T]wo of them or was there just one of them? |
| [Mr. Crayton]: | She said it was just one. |
| [Officer]: | Okay. And who is this laying down on the ground? |
| [Mr. Crayton]: | . . . [M]y friend's baby mother. |
| [Officer]: | Okay. |
| [Officer 2]: | . . . [W]hat room do you guys have? What room were they in? |
| [Mr. Crayton]: | They were in 319. Is she alright? [into phone] Yeah, I need 315, please. [Crayton walks away to talk in phone.] |

.    .    .

| [Mr. Crayton]: | Paul, you need to get down here, bro. Oh, my God, dude. . . . [H]e stabbed them both. Yes. He stabbed them both. Yes. |
| --- | --- |
| [Officer]: | Who is he? |
| [Phone Voice]: | What . . . am I going to do? I have the baby. |
| [Mr. Crayton]: | I know. I'm trying to come get you, but the cops won't let me. |
| [Phone Voice]: | Should I come down? |
| [Mr. Crayton]: | . . . [N]o, it's bad Paul. Oh, my God. |

[¶68] At the Rule 21 hearing, defense counsel explained the defense team did not object to the videotape because they believed it would be helpful for the jury to see the scene.

The video shows Ms. Arce did not "behave[e] in a way that, you know, a normal victim would behave." She did not take the most direct route to get help and did not use her cell phone to call law enforcement. Counsel continued:

> [S]o by seeing that right there between the lobby of the Quality Inn and Room 119, she passed many doors, we thought it would be helpful for the jury to know that, that she passed rooms, didn't knock on doors, didn't seek help there. Instead she called Mr. Crayton for assistance.

Defense counsel further stated she believed the video was helpful because it shows Mr. Crayton, with no evidence, accused Mr. Fairbourn. Because law enforcement officials took Mr. Crayton's assertions at face value, even though his opinion lacked foundation, this evidence corroborated the defense theory that there was a "rush to judgment."

[¶69] Mr. Fairbourn's third argument is that defense counsels' failure to call two witnesses, Anthony Garcia and Barry Bernstein, constitutes ineffective assistance. Sergeant Moser interviewed Mr. Garcia, a guest in Room 123, and Mr. Bernstein, who stayed in Room 125. Sergeant Moser's report reflects that Mr. Garcia stated he and a co-driver checked in to the Quality Inn at about 10:30 p.m. on June 22, 2016. Mr. Garcia told Sergeant Moser that at approximately 12:00 to 12:30 a.m. Mr. Garcia saw a man wearing a red shirt walk by the front window of his hotel room. The man slowed down and looked through the window as though he were looking for someone. The window curtains were open, and Mr. Garcia saw the man was white, wearing a red t-shirt. The man was taller and had short brown hair. The man continued walking toward Room 119. Mr. Garcia did not see where the man went, just that the man was walking in that general direction. About thirty minutes later, Mr. Garcia again saw the same man walk in front of his room. The man stopped and it appeared he was going to knock on the door, but continued walking. Approximately five minutes later, the man walked by again headed in the direction of Room 119. Mr. Garcia, approximately an hour later, heard what sounded like sexual activity—a headboard hitting against the wall for about ten seconds. Mr. Garcia never heard any talking or screaming. About another thirty minutes later, he saw police speaking to a man in a white t-shirt. He overheard that man say his girlfriend had been stabbed and that a guy in a red shirt had run from the scene.

[¶70] Mr. Bernstein told Sergeant Moser that at approximately 1:38 a.m. he heard someone say, "I never thought he would stab her in the chest." Mr. Bernstein made sure Sergeant Moser wrote his words down verbatim. Mr. Bernstein stated he did not get out of bed and did not see the person who was talking. He heard no other voices, so he assumed it was a telephone call.

[¶71] Mr. Fairbourn argues these witness statements were credible evidence of an alternative suspect. He claims Mr. Garcia's testimony could have established there was

another man in a red shirt, and the sexual noises he heard would impeach Ms. Arce's testimony that she and Ms. Story had not entertained any other men at the Quality Inn that night. As to Mr. Bernstein, Mr. Fairbourn suggests the overheard conversation may have raised the possibility of one assailant speaking with another.

[¶72] At the Rule 21 hearing, defense counsel explained that he did not subpoena Mr. Garcia because his testimony was potentially more damaging than helpful. If Mr. Garcia's timeline was correct, and he identified Mr. Fairbourn as the man in the red shirt, this would mean Mr. Fairbourn was at the Quality Inn "scoping the area" prior to receiving the room number from Ms. Story and Ms. Arce. If Mr. Garcia's timeline was off, and he identified Mr. Fairbourn as the man in the red shirt, then the actions Mr. Garcia described corroborated Ms. Arce's testimony. The defense team was also concerned that, if they showed Mr. Garcia a picture of Mr. Fairbourn, he might have contacted the prosecution and provided another eyewitness identification.

[¶73] Similarly, Mr. Bernstein stated he was asleep, woke up, heard the conversation, and then went back to sleep. One of the videos from an officer's body camera, recorded about the time Mr. Bernstein said he heard this conversation, showed Mr. Crayton standing in front of Mr. Bernstein's room. He was talking with Mr. Lovato and the officer and he was telling Mr. Lovato the women had been stabbed. According to defense counsel, the purpose of introducing these statements through Sergeant Moser was to support the theory that the investigation prematurely focused on Mr. Fairbourn. It was not for the substantive evidentiary value of these witnesses' testimony.

[¶74] In his fourth claim, Mr. Fairbourn asserts defense counsel elicited opinions from two law enforcement witnesses regarding their assessment of Mr. Fairbourn's guilt. Mr. Fairbourn recounts Commander Robinson's testimony, that he believed he knew Mr. Fairbourn committed the crimes. *See supra* ¶ 28. In addition, Mr. Fairbourn points to Detective Salazar's testimony that early in the investigation, "I didn't feel he was guilty, but the evidence that I was obtaining during that time was leading me to believe that, yes, he was the one sole primary suspect."

[¶75] Mr. Fairbourn argues that the cumulative effect of these errors presents a reasonable probability that, but for the errors, the jury would have reached a more favorable verdict. Our purpose when evaluating for cumulative error is "to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice the defendant to the same extent as a single reversible error." *Hernandez v. State*, 2010 WY 33, ¶ 29, 227 P.3d 315, 324 (Wyo. 2010) (citing *Guy v. State*, 2008 WY 56, ¶ 45, 184 P.3d 687, 701 (Wyo. 2008) (quoting *McClelland v. State*, 2007 WY 57, ¶ 27, 155 P.3d 1013, 1022 (Wyo. 2007))).

[¶76] Assuming, without deciding, that all Mr. Fairbourn's claims demonstrate defense counsel's substandard representation,[7] his arguments cannot overcome the overwhelming evidence of his guilt:

- Text messages between Mr. Fairbourn and Ms. Arce beginning at 9:54 p.m. and continuing until Mr. Fairbourn received the room number at 1:04 a.m.

- Traveling from Rawlins to Rock Springs without funds to pay for expected services.

- Ms. Arce's eyewitness testimony that Mr. Fairbourn was the person who stabbed her and Ms. Story.

- Video placing Mr. Fairbourn next to the building where the knife was found.

- Mr. Fairbourn's evolving fabrications in statements to law enforcement and others.

- Ms. Story's cell phone in Mr. Fairbourn's pocket.

- Ms. Story's blood and DNA found on Mr. Fairbourn's pants which were "stained throughout."

- Mr. Fairbourn's DNA on the handle of the knife.

- Ms. Story's and Ms. Arce's DNA on the knife blade.

[¶77] Although defense counsel posed alternative explanations—transference of the DNA and the possibility of an unknown assailant—these required the jury to ignore the physical and testimonial evidence presented at trial. The text messages traced Mr. Fairbourn's movements prior to the crime; the JFC Engineers & Surveyors video placed Mr. Fairbourn at the location where the knife was discovered; the DNA evidence and Ms. Story's cell phone connected him to the victims; and the surviving victim identified him as the assailant. There is no reasonable probability that a jury would have reached a more favorable conclusion.

### III.   Was Mr. Fairbourn denied his constitutional right to due process of law and a fair trial due to prosecutorial misconduct?

---

[7] The district court determined none of these claims established ineffective assistance given the trial strategy pursued in Mr. Fairbourn's defense.

[¶78] Mr. Fairbourn contends the prosecutor improperly and repeatedly elicited opinion testimony from witnesses referring to the credibility of other witnesses. In addition, he claims the prosecutor's closing argument improperly argued impact evidence and matters unsupported by the evidence.

## A. Standard of Review

[¶79] Defense counsel did not object to these incidents at trial and, therefore, we apply the plain error standard of review to these claims. *Bogard v. State*, 2019 WY 96, ¶ 18, 449 P.3d 315, 321 (Wyo. 2019). To establish plain error, Mr. Fairbourn "must show 1) the record clearly reflects the incident urged as error; 2) a violation of a clear and unequivocal rule of law; and 3) that he was materially prejudiced by the denial of a substantial right." *Id.* ¶ 21, 449 P.3d at 321 (citations omitted). The wide latitude afforded to the prosecutor in closing argument permits comment on all the evidence and the reasonable inferences arising therefrom. *Teniente v. State*, 2007 WY 165, ¶ 30, 169 P.3d 512, 524 (Wyo. 2007). "[O]ur ultimate focus and attention is on whether the alleged error affected Mr. [Fairbourn's] substantial right to a fair trial." *Bogard*, ¶ 18, 449 P.3d at 321 (citations omitted).

## B. Analysis

### 1. Trial

[¶80] Mr. Fairbourn claims that at trial, the prosecutor improperly invited witnesses to testify regarding the credibility of other witnesses and the guilt of the defendant. The first factor of our plain error review is satisfied because the record clearly reflects the incidents alleged as error. As to the second factor, "there is a clear and unequivocal rule of law prohibiting testimony that provides an opinion about a defendant's guilt or vouches for the credibility of a witness." *Dumas v. State*, 2018 WY 120, ¶ 23, 428 P.3d 449, 455 (Wyo. 2018).

[¶81] During Detective Salazar's cross-examination, defense counsel asked, "And did you consider in your investigation why [Mr. Fairbourn] would be just walking around the parking lots instead of getting away from the scene if he just killed a person and wounded another? Did that make sense to you?" Detective Salazar responded, "I did have considerations on that, and I have my own opinion on that, yes." On redirect examination, the prosecutor asked, "Now, Defense counsel talked about why didn't [Mr. Fairbourn] just leave. . . . [W]hy didn't he just get out of there and jump on I-80 and go, and you said, well, I have an opinion about that. What's your opinion about that?" Detective Salazar answered,

My opinion is that he was very disoriented, he didn't know what to do. He was very overwhelmed because he just got done stabbing two women, and his head was not in the right place, so he is kind of wandering around thinking what is my next step going to be.

[¶82] The State argues the prosecutor was not trying to elicit improper vouching testimony. Rather, he was attempting to clarify Detective Salazar's logic as to why Mr. Fairbourn did not immediately leave the scene. However, Detective Salazar's opinion was without foundation and assumed Mr. Fairbourn's guilt. This was an improper question. *Large v. State*, 2008 WY 22, ¶ 18, 177 P.3d 807, 813 (Wyo. 2008) (finding error where "the overall tenor of the questioning promotes the conclusion that Dr. Gibson held an opinion that Ms. Large was guilty of abusing JL").

[¶83] The prosecutor also initiated the following conversation with Detective Salazar:

> Q. You heard testimony that [Ms. Arce and Mr. Crayton] were lying to the officers [about their reason for being in Rock Springs]. Did you feel that was evidence that they committed this crime?
>
> A. No. I felt like they were lying because they did not want to get in trouble for what they were actually doing in Rock Springs.
>
> Q. Okay. . . . [W]as anyone else lying to you besides Ms. Arce and Mr. Crayton?
>
> A. No, not to my recollection.
>
> Q. How about Mr. Fairbourn?
>
> A. Yes, he did lie to me.

[¶84] After the lunch break, the district court conferred with the attorneys and stated, "Right at the end . . . today, you asked if the Defendant was lying, and that's not a proper question." The district court offered to give a curative instruction. The attorneys did not feel a curative instruction was necessary. The district court admonished both counsel for the prosecution and the defense to refrain from asking "are they lying" questions in the future because the credibility of the witnesses was for the jury to determine.

[¶85] It is settled law that "[a] witness may not comment on the truthfulness or veracity of another witness." *McGinn v. State*, 2015 WY 140, ¶ 14, 361 P.3d 295, 299 (Wyo.

24

2015) (quoting *Barnes v. State*, 2011 WY 62, ¶ 11, 249 P.3d 726, 730 (Wyo. 2011)); *Schreibvogel*, ¶ 41, 228 P.3d at 888; *Huff v. State*, 992 P.2d 1071, 1079 (Wyo. 1999). "It is the province of the jury to weigh the credibility of the witnesses." *Beaugureau v. State*, 2002 WY 160, ¶ 17, 56 P.3d 626, 636 (Wyo. 2002) (citation omitted).

[¶86] Having established the first two factors of plain error, Mr. Fairbourn must show he was prejudiced by the error. We evaluate the prejudice of improper "were-they-lying" questions by weighing several factors: "1) the severity and pervasiveness of the misconduct; 2) the significance of the misconduct to the central issues in the case; 3) the strength of the State's evidence; 4) the use of cautionary instructions or other curative measures; and 5) the extent to which the defense invited the misconduct." *Talley v. State*, 2007 WY 37, ¶ 16, 153 P.3d 256, 262 (Wyo. 2007).

[¶87] Examining prejudice in light of the entire record,[8] the strength of the State's case did not rely solely on witness testimony. Prodigious electronic, physical, and forensic evidence supported the jury's determination. Mr. Fairbourn has not established prejudicial error, and thus, has not established plain error.

### 2. Closing Argument

[¶88] Mr. Fairbourn contends the prosecutor improperly argued irrelevant victim impact testimony and matters not in evidence. "Prosecutorial misconduct is '[a] prosecutor's improper or illegal act (or failure to act) . . . involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Bogard*, ¶ 16, 449 P.3d at 320–21 (citations omitted). Mr. Fairbourn claims the prosecutor's remarks that Ms. Story was crying, begging, and pleading for her life while she was being stabbed were improper and not based on the evidence. In addition, the prosecutor argues that although the women were providing massage services, they were "victims" who were not only "someone's daughter . . . sister . . . mother" but also "[h]umans." The prosecutor referred to Mr. Fairbourn as "heartless" and described Ms. Story's encounter with Mrs. Moss, as "fall[ing] into the arms of an angel."

[¶89] "Attorneys are afforded wide latitude during closing argument and may comment on evidence admitted during trial and suggest reasonable inferences." *Hartley v. State*, 2020 WY 40, ¶ 13, 460 P.3d 716, 720 (Wyo. 2020) (citing *Bogard*, ¶ 19, 449 P.3d at 321). "[W]e review the entire argument, and do not isolate discrete parts of the argument that may be taken out of context." *Larkins v. State*, 2018 WY 122, ¶ 95, 429 P.3d 28, 50

---

[8] In closing argument, defense counsel claimed law enforcement made "a rush to judgment" and failed to present sufficient evidence of who actually stabbed Ms. Story and Ms. Arce or why. Defense counsel reviewed the lies told by Ms. Arce, Mr. Lovato, and Mr. Crayton to investigators, and noted the investigation never followed up on this evidence.

(Wyo. 2018). "It is difficult for a defendant to show plain error in closing argument, 'lest the trial court becomes required to control argument . . . .'" *Id*. (citations omitted). Here, it is unnecessary to determine whether the particular comments made in closing violated the rules because in the context of this trial, such comments were not prejudicial. *See Black v. State*, 2020 WY 34, ¶ 40, 458 P.3d 1245, 1254 (Wyo. 2020). As we have already explained, the evidence of guilt—"[t]he single most significant factor in determining whether Mr. [Fairbourn] was prejudiced"—was overwhelming. *Bogard*, ¶ 72, 449 P.3d at 332. The prosecutor's comments were brief and, for the most part, reasonable inferences from the evidence adduced at trial. Mr. Fairbourn has failed to show he was prejudiced by the prosecution's conduct, and therefore, his claim of prosecutorial misconduct fails.

## *CONCLUSION*

[¶90] Mr. Fairbourn was not denied his right to a speedy trial under either W.R.Cr.P. 48 or the United States Constitution. He has not established ineffective assistance of counsel nor has he shown prejudicial prosecutorial misconduct. Affirmed.