# IN THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 74

APRIL TERM, A.D. 2022

June 16, 2022

DAVID EDWARD INGERSOLL,

Appellant
(Defendant),

v.                                                                S-21-0226

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Sheridan County*
The Honorable John G. Fenn, Judge

*Representing Appellant:*
> Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Francis H. McVay, Senior Assistant Appellate Counsel. Argument by Mr. McVay.

*Representing Appellee:*
> Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Donovan Burton, Assistant Attorney General. Argument by Mr. Burton.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, and GRAY, JJ., and KRICKEN, D.J.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**KRICKEN**, **District Judge**.

[¶1]     David Edward Ingersoll was convicted by a jury of sexual abuse of a minor in the second degree.  He argues plain error occurred at trial when several State witnesses vouched for the credibility of other State witnesses and/or offered opinions of his guilt.  We affirm.

## ISSUES

[¶2]     Mr. Ingersoll raises two issues, which we restate as follows:

1.    Did the district court commit plain error by allowing State witnesses to vouch for the credibility of other State witnesses and/or to offer opinions as to Mr. Ingersoll's guilt?

2.    Did the accumulated effect of the errors deprive him of a fair trial?

## FACTS

[¶3]     In April or May 2019, Mr. Ingersoll met SS, his cousin, at a family funeral.  Mr. Ingersoll was forty-eight years old; SS was fifteen.  Mr. Ingersoll gave SS a ride from the funeral service to the graveyard.  After the funeral, Mr. Ingersoll and SS communicated every day via various social media.  Mr. Ingersoll told SS he loved her; "[he would] marry her;" "[he would] have sex with [her] every night;" and "he [would] have kids with [her]."  SS posted a picture on social media showing her with Mr. Ingersoll and referring to him as her "best friend."

[¶4]     Around July 4, 2019, SS was at Walmart with her parents and her older sister, VL, when they encountered Mr. Ingersoll and engaged in friendly conversation.   SS subsequently left her family to go to the electronics and toy departments; Mr. Ingersoll followed her.  As SS walked by the family bathroom, Mr. Ingersoll pulled her into the bathroom; kissed her; and penetrated her vagina with his penis, causing her to bleed.  When he was finished, Mr. Ingersoll told SS to hide behind the bathroom door and let him leave first.  After SS left the bathroom, VL called her on her cellphone and said the family was waiting for her in the car.  SS returned to the family's car.  Mr. Ingersoll texted SS and told her not to reveal the bathroom incident to anyone.  When SS told him she was bleeding, Mr. Ingersoll advised her to report it was her menstrual period.

[¶5]     Later that evening or the next day, SS told VL she "had sex" with Mr. Ingersoll in the bathroom at Walmart and she was bleeding.  VL told their mother, but their mother did not believe VL.  SS informed their mother about the bleeding but did not reveal the bathroom incident.  About a week later, on July 12, 2019, their mother took SS to the doctor

1

for the bleeding. Because SS told the doctor she did not have sex, the doctor did not perform a sexual assault examination.

[¶6] Three days later, on July 15, 2019, VL told her counselor, Jennifer Banks, that SS said she had sex with Mr. Ingersoll in the Walmart bathroom. Ms. Banks, who was also SS's counselor, confronted SS; SS denied having sex with Mr. Ingersoll. Nevertheless, Ms. Banks reported the allegations to the Department of Family Services (DFS), which reported it to the Sheridan Police Department. A week later, Sergeant James Hill and a DFS caseworker interviewed SS, who admitted she was friends with Mr. Ingersoll but denied any sexual contact occurred at Walmart. Sergeant Hill suspended his investigation.

[¶7] In October 2019, SS gave her teacher a letter detailing the sexual encounter with Mr. Ingersoll in the Walmart bathroom. The teacher informed SS's parents and school staff about the letter, and the staff reported it to Sergeant Hill. SS also wrote a letter to her mother describing the encounter and apologizing for lying. Sergeant Hill and the DFS caseworker interviewed SS a second time. This time, SS informed them Mr. Ingersoll had sex with her in the Walmart bathroom. Mr. Ingersoll was charged and convicted by a jury of second-degree sexual abuse of a minor in violation of Wyoming Statute § 6-2-315(a)(i) (LexisNexis 2021). The district court sentenced him to 16-20 years in prison. This appeal followed.

## DISCUSSION

### A. Vouching and Testimony of Guilt

[¶8] At trial, SS, VL, Ms. Banks, and Sergeant Hill testified for the State. Mr. Ingersoll contends these witnesses impermissibly vouched for the credibility of other State witnesses and/or offered opinions of his guilt.

[¶9] "Evidentiary rulings are . . . committed to the sound discretion of the district court and are not subject to appellate second guessing absent an abuse of discretion." *Cazier v. State*, 2006 WY 153, ¶ 10, 148 P.3d 23, 28 (Wyo. 2006) (citing *Lopez v. State,* 2004 WY 103, ¶ 21, 98 P.3d 143, 149 (Wyo. 2004)). In this case, however, because no objection was made to the subject testimony, our review is for plain error. *Id.* To satisfy the plain error standard, Mr. Ingersoll "'must show (1) the record is clear about the incident alleged as error; (2) a violation of a clear and unequivocal rule of law; and (3) he was denied a substantial right resulting in material prejudice.'" *Mendoza v. State*, 2021 WY 127, ¶ 12, 498 P.3d 82, 85 (Wyo. 2021) (quoting *Ridinger v. State*, 2021 WY 4, ¶ 33, 478 P.3d 1160, 1168 (Wyo. 2021)) (other citation omitted).

[¶10] The first prong of plain error review is satisfied because the alleged improper testimony is clearly reflected in the record. *Id.*, ¶ 13, 478 P.3d at 85. To satisfy the second prong of plain error review, Mr. Ingersoll "'must demonstrate the existence of a clear and

unequivocal rule of law which the particular facts transgress in a clear and obvious, not merely arguable, way.'" *Ridinger*, ¶ 34, 478 P.3d at 1168 (quoting *Brown v. State*, 2019 WY 102, ¶ 13, 450 P.3d 208, 211 (Wyo. 2019)). As we will explain, Mr. Ingersoll did not meet his burden on the second prong with respect to any of the subject testimony. Therefore, we need not address the third prong. *Id.*, ¶ 43, 478 P.3d at 1170.

### *Testimony of SS*

[¶11] At trial, SS told the jury about meeting Mr. Ingersoll at the funeral and their subsequent communications over social media. She recounted him pulling her into the Walmart bathroom and penetrating her vagina with his penis. She explained to the jury that she initially denied the sexual abuse occurred to avoid getting him in trouble. However, she eventually wrote letters to her teacher and her mother describing the abuse. With respect to the letter to her mother, the following exchange occurred between SS and the prosecutor:

> Q      What did you do after you wrote that letter [to your mother]?
>
> A      *[My mother] finally believed [VL].* And I told her I need to tell [VL] – to say sorry to her because she went to Yellowstone [Boys & Girls Ranch] because of me.

(Emphasis added). After writing the letters to her teacher and mother, SS testified she disclosed the Walmart incident to Sergeant Hill.

[¶12] Mr. Ingersoll claims SS improperly vouched for VL's credibility when she told the jury that, after reading her letter, her mother "finally believed [VL]." "It is settled law that '[a] witness may not comment on the truthfulness or veracity of another witness.'" *Fairbourn v. State*, 2020 WY 73, ¶ 85, 465 P.3d 413, 432 (Wyo. 2020) (quoting *McGinn v. State*, 2015 WY 140, ¶ 14, 361 P.3d 295, 299 (Wyo. 2015)) (other citations omitted).

> The purpose of this rule is to preserve the integrity of the jury process by protecting the jury's right to act as the final determiner of the credibility of the witnesses. We have stated, however, that a trial court does not necessarily commit plain error when it allows testimony which illuminates some aspect of the case even though the testimony incidentally bolsters the credibility of another witness.

*Strickland v. State*, 2004 WY 91, ¶ 22, 94 P.3d 1034, 1045-46 (Wyo. 2004) (quoting *Blumhagen v. State*, 11 P.3d 889, 894 (Wyo. 2000)) (internal citations omitted).

3

[¶13] SS did not improperly comment on VL's credibility or encroach on the jury's duty to determine VL's credibility. SS did not testify VL was truthful or that her mother believed VL because VL was a truthful person. SS simply described the effect of her letter on her mother. Placed in context with the remainder of SS's testimony, this testimony "illuminate[d]" the course of events, from SS's initial disclosure to VL; her subsequent denials to her mother and Ms. Banks; and finally her disclosure of the sexual encounter to her teacher, her mother, and Sergeant Hill. Any effect SS's testimony may have had on VL's credibility "was purely incidental and . . . not plain error." *Garriott v. State*, 2018 WY 4, ¶ 43, 408 P.3d 771, 786 (Wyo. 2018). *See also, Byerly v. State*, 2019 WY 130, ¶ 27, 455 P.3d 232, 243 (Wyo. 2019) (dentist's testimony that victim is "a pretty tough girl. She's not a whiner or somebody that whines every time you touch her. So I think if she says she's in pain, I probably would agree that she is" spoke to the victim's "pain threshold, not to her veracity, and though it may have incidentally bolstered the credibility of victim's claims of pain, it was not vouching testimony").

### Testimony of VL

[¶14] VL testified that after the family returned home from Walmart, SS was "nervous and shaky and scared and her eyes were watering." When VL asked what was wrong, SS said she was bleeding. VL responded, "Oh, it must be your period." The next day, SS told VL, "I only bled for a day, sis." VL told the jury:

> And, I was like, "How is that possible?" The only way that would have happened if you only bled for a day is one thing you're spotting, or, two, you had intercourse and you stretched yourself to where you bled. And those are the only explanations, but yet she never spotted in her life when it came to her period. *So the only explanation was that she had intercourse.*

(Emphasis added). Subsequently, the prosecutor asked VL whether SS told her what happened. VL responded, "That's when [SS] confessed to me that [she] and [Mr. Ingersoll] went into the family's bathroom in the back and had intercourse." Although she promised not to tell anyone what SS had disclosed, VL told her mother and Ms. Banks. VL further testified:

> And I told [Ms. Banks] what was going on and what [SS] had told me. And when I got out [of my counseling session], it was [SS]'s turn to see [Ms. Banks]. And then [Ms. Banks] came out with [SS] and pulled me over and said, "[SS] denied it."
>      And that's when the first initial investigation happened, because I told [Ms. Banks] what [SS] had told me, *but then*

4

*again [SS] denied it. [SS] was saying it never happened and that I was the one that was lying.*

> Q *Were you lying?*
> A *I was not.*
> Q That was what [SS] had told you?
> A Yes.

(Emphasis added).

[¶15]   Mr. Ingersoll argues VL's testimony that "the only explanation was that she had intercourse" constituted an improper opinion of his guilt.  "The law is clear that it is the jury's role to determine the guilt of the accused and a witness may not express an opinion as to his guilt." *Fennell v. State*, 2015 WY 67, ¶ 24, 350 P.3d 710, 719 (Wyo. 2015) (citing *Carter v. State*, 2012 WY 109, ¶ 11, 282 P.3d 167, 170 (Wyo. 2012)) (other citations omitted).   However, "[t]estimony that is otherwise admissible will not be excluded unless it constitutes an *actual conclusion* about the guilt or innocence of the accused party . . . . 'An interpretation of the evidence by a witness, even though that interpretation may be important in establishing an element of the crime and thus leading to the inference of guilt, is not in the same category as an actual conclusional statement on the guilt or innocence of the accused party.'" *Ogden v. State*, 2001 WY 109, ¶ 23, 34 P.3d 271, 277 (Wyo. 2001) (emphasis added) (quoting *Saldana v. State*, 846 P.2d 604, 616 (Wyo. 1993)).  *See also, Nielsen v. State*, 2018 WY 132, ¶ 26, 430 P.3d 740, 749 (Wyo. 2018) ("[T]estimony need not be excluded unless it contains an *actual conclusion* about the guilt or innocence of the accused party, . . . and a witness may interpret evidence even though that interpretation may be important in establishing an element of the crime and thus leading to the inference of guilt.") (emphasis added) (citation and internal quotations omitted).

[¶16]   VL did not improperly opine on Mr. Ingersoll's guilt.  Rather, when VL's testimony is read in context, it is clear she was simply explaining her thought process in response to SS telling her she had only bled for one day.  She determined SS was either spotting or had intercourse.  Based on her personal knowledge of SS's menstrual cycle, VL concluded SS had sexual intercourse.  VL did not, however, offer an opinion as to with whom SS had sex, let alone indicate it was with Mr. Ingersoll.  While her conclusion arguably may have led to an inference that SS had intercourse with Mr. Ingersoll, VL was simply interpreting the evidence based on her personal knowledge and observations and did not offer an "actual conclusion" concerning Mr. Ingersoll's guilt.

[¶17]   Mr. Ingersoll complains VL improperly vouched for her own credibility by telling the jury she was not lying when she disclosed to Ms. Banks that SS told her she had sex with Mr. Ingersoll.  He does not provide any authority establishing there is a clear and unequivocal law prohibiting witnesses from vouching for their own credibility. *Cf. State v. Maxon*, 465 P.3d 304, 305 (Or. App. 2020) ("The vouching rule is not implicated, however, when a witness asserts his or her own truthfulness:  '[A] witness does not

impermissibly "vouch for" or "bolster" his or her *own* testimony by proclaiming truthfulness.'" (quoting *State v. Sanchez-Jacobo*, 282 P.3d 880 (Or. App. 2012), *rev. den.*, 298 P.3d 30 (Or. 2013))). As a result, Mr. Ingersoll has failed to establish the district court committed plain error by allowing the prosecutor to question VL about her own veracity.

[¶18] Mr. Ingersoll also maintains the prosecutor asking VL if she was lying constituted an impermissible "were-they-lying" question. It is improper for a prosecutor to ask a defendant during cross-examination whether other witnesses were lying ("were they lying" questions) because such questions: (1) "invade the province of the jury, as determinations of credibility are for the jury;" (2) "are argumentative and have no probative value;" (3) "create a risk that the jury may conclude that, in order to acquit the defendant, it must find that a contradictory witness has lied;" (4) "are inherently unfair, as it is possible that neither the defendant nor the contradictory witness has deliberately misrepresented the truth;" and (5) "create a 'no-win' situation for the defendant: if the defendant states that a contradictory witness is not lying, the inference is that the defendant is lying, whereas if the defendant states that the witness is lying, the defendant risks alienating the jury." *Talley v. State*, 2007 WY 37, ¶¶ 10-11, 153 P.3d 256, 260 (Wyo. 2007) (citations omitted). *See also, McGinn*, ¶ 15, 361 P.3d at 299 ("It is 'misconduct for the prosecutor to cross-examine a defendant using the "lying" or "mistaken" technique (i.e., well, then if "so-and-so" said "such-and-such," was he "mistaken" or "lying?")' . . . . These questions are improper because they 'require a defendant to comment on another witness' veracity . . . invade the province of the jury, create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the other witnesses lied, and distort the state's burden of proof.'" (quoting *Barnes v. State*, 2011 WY 62, ¶ 9, 249 P.3d 726, 728-29 (Wyo. 2011), and *Beaugureau v. State*, 2002 WY 160, ¶ 17, 56 P.3d 626, 635-36 (Wyo. 2002)) (other citations omitted). "The admonition against asking the [defendant] whether other witnesses lied applies equally to asking any witness whether another witness has lied." *Proffit v. State*, 2008 WY 114, ¶ 16, 193 P.3d 228, 236 (Wyo. 2008) (citing *State v. Manning*, 270 Kan. 674, 19 P.3d 84, 100–01 (2001)).

[¶19] Mr. Ingersoll acknowledges that, because the prosecutor asked VL whether she was lying, the question "at first blush, . . . does not appear to qualify as a 'were-they-lying' question." However, because SS claimed VL was lying and VL said she was not lying, he argues VL was essentially asked whether SS was lying, which is improper. We decline to engage in such mental gymnastics, especially on plain error review "[where] we reverse a trial court's decision only if it is so plainly erroneous that the judge should have noticed and corrected the mistake even though the parties failed to raise the issue." *Causey v. State*, 2009 WY 111, ¶ 19, 215 P.3d 287, 293 (Wyo. 2009). The prosecutor did not ask VL whether SS was lying. She asked VL whether VL was lying. Because such question is not an improper "were-they-lying" question, Mr. Ingersoll cannot establish error, let alone plain error.

### Testimony of Ms. Banks

6

[¶20]   Ms. Banks testified that at the July 15, 2019, counseling session, SS reported feeling stressed over VL lying that SS had sex with Mr. Ingersoll.  Ms. Banks reported the allegations to DFS because she is a "mandatory reporter," which, she explained to the jury, means she has to report if she has "knowledge that someone might have been sexually abused or any kind of child abuse."  Later, on re-direct examination, the prosecutor asked Ms. Banks, "And, again, why did you report to DFS what was discussed in that first session with [SS]?"  Ms. Banks responded:

> Just based upon my supervision and my training and my work with at-risk children, I reported because I felt I had to.  And I'm not an investigator.  I don't know - - I subsequently had no idea what happened *until recently*, but I just felt I had to report because I had knowledge that someone could have hurt my client, and that's what I'm called to do and we're under a code of ethics to report *things*, not just *suspected* child abuse.

(Emphasis added).

[¶21]   Mr. Ingersoll complains Ms. Banks alluded to his guilt while also vouching for SS's and VL's testimony.  It is difficult to ascertain Mr. Ingersoll's argument.  He emphasizes Ms. Banks' testimony that she had no idea what happened "until recently" and that she reports not just "suspected" child abuse but "things."  From what we can garner, he is suggesting (1) Ms. Banks' testimony about recently learning what had happened somehow improperly vouched for SS's and VL's credibility and offered an opinion of his guilt, and (2) her testimony that she has a duty to report "not just suspected child abuse" but "things" indicates the allegations in this case were confirmed, thereby opining about his guilt.

[¶22]   The subject testimony did not comment, or even suggest, that Ms. Banks believed SS or VL.  Indeed, Ms. Banks told the jury she was not an investigator, meaning her job was not to determine the truth of what occurred.  Nor did Ms. Banks offer an "actual conclusion" regarding Mr. Ingersoll's guilt.  In *Large v. State*, 2008 WY 22, ¶ 15, 177 P.3d 807, 812 (Wyo. 2008), the victim's psychologist testified he had a "duty to report sexual abuse if [he] believe[d] it's occurring."  We concluded this testimony did not improperly opine as to the defendant's guilt because it "implicate[d] only [the psychologist]'s opinion regarding whether sexual abuse was occurring[;]" "d[id] not provide an opinion regarding the perpetrator of the abuse[;] and [was] potentially relevant as context for the investigation."  *Id.*, ¶ 17, 177 P.3d at 813.  However, we found it was improper for the psychologist to testify that the defendant was one of two who "possibly perpetrated" the abuse because such testimony constituted an opinion that the defendant was guilty.  *Id.*, ¶ 18, 177 P.3d at 813.

7

[¶23]   In this case, Ms. Banks did not "provide an opinion regarding the perpetrator of the [alleged] abuse" or name Mr. Ingersoll as the abuser.  She simply explained why she reported the alleged abuse even though SS denied it occurred.  Her testimony also provided relevant context to the course of investigation, including how the police initially became involved.  Similarly, there is absolutely no indication that Ms. Banks' statement that she did not know "until recently" what happened pertained to Mr. Ingersoll's guilt.  Read in context, it appears she was merely informing the jury that she had only recently learned what had occurred following her reporting.

[¶24]   Because Ms. Banks' testimony did not vouch for the credibility of others or offer an opinion of guilt, Mr. Ingersoll has failed to show her testimony transgressed a clear and unequivocal rule of law.

### *Testimony of Sergeant Hill*

[¶25]   Sergeant Hill, who testified as a lay witness, described to the jury his training and experience as an investigator in sexual offense cases, including attending three sexual assault seminars and receiving "specialized training" in investigating child abuse cases. He also explained that when investigating any crime, including sex crimes, he tries "to go back in time and find out what happened in a moment that [he] wasn't present for[.]"  He told the jury that in sexual abuse cases involving minor or vulnerable victims, offenders often "groom" their victims.  He defined "grooming" as "behavior by a person meant to wear down the natural defenses or reaction of another person."  He described grooming as follows:

> Basically getting close to somebody, just like you build a relationship with anybody.  In grooming it has the negative [connotations] of the person who's doing the grooming, the possible perpetrator is doing it with the intent to initiate some sort of abuse.  So they are slowly working on the defenses of the possible victim with the purpose of perpetrating some sort of abuse or crime against them.  And it goes from -- whether it's just getting someone's natural defenses as far as -- use the example of a fraud scheme or something like that, somebody gets close to somebody for the intention of abusing them financially.  We also see it in sexual abuse crimes where someone is trying to build a relationship and get past someone's natural defenses to commit some form of sexual abuse.

[¶26]   Sergeant Hill testified that in child sex abuse cases, the relationship between the perpetrator and victim "start[s] innocuously.  Two people meet each other[,] and the grooming begins when the perpetrator identifies that the person [he/she] met might be

someone [he/she] can victimize." He explained the perpetrator identifies a need in the victim's life and seeks to fill that need. For example, if the victim does not have many friends, the perpetrator will become the victim's friend. Sergeant Hill testified secrecy is a large factor in the grooming process because it forms a bond between the perpetrator and victim and isolates the victim from outside support systems.

[¶27] Sergeant Hill testified about his receipt of the report from DFS and his initial interview with SS, where she denied having sex with Mr. Ingersoll but admitted she posted a picture of herself with Mr. Ingersoll on social media and captioned it "[w]ith my best friend." The prosecutor then questioned Sergeant Hill as follows:

> Q  And earlier you described about the grooming.
> Did you see any signs that you've recognized from your training and your experience in investigations like this, [did] you see any signs of grooming in that first interview?
> A  Yes, I did.
> Q  What were some of those signs?
> A  The things that I noticed during the interview that match up with some of the items I testified about earlier is this idea of what would normally be an inappropriate relationship seemingly becoming appropriate. On surface level seeing a man in his late 40s being posted as "my best friend" with a young teenage girl would seem on its face to be inappropriate. So those sorts of buildings of friendship that [SS] described in the interview of how she told us that she related to Mr. Ingersoll as a friend. During the interview, I even pointed out or [the DFS caseworker] pointed out [to SS], "You're talking about him as if he's a peer when he's clearly not." So it seemed very much that idea of somebody coming forward and filling a need in a possible victim's life.

[¶28] Thereafter, Sergeant Hill testified about re-opening his investigation after receiving the letter SS sent to her teacher. He said he re-interviewed SS and searched her phone and social media activity. Following cross-examination, the prosecutor and Sergeant Hill engaged in the following colloquy on re-direct:

> Q  [O]n cross-examination, you were asked some questions about the defendant being familiar with the family.
> Is that something that you expect in these types of investigations?
> A  Yes, I do.
> Q  And why is that?

9

A    I know from my training and experience, that often the perpetrators of sexual abuse against children [are] . . . relative[s] or someone well-known to the family. And, generally, as part of the grooming process, the relationship is developed when there's a potential child victim, not only with the victim, but also with the family. Getting the trust of the caregivers and those close to the victim are also part of that process.

Q    And in your training and experience in that role, what's the rationale behind a perpetrator doing that?

A    The rationale is to gain trust so that they can use the whole process to lower the natural defenses of the victim or those that are close to them so that behavior that would normally be flagged in their minds as objectionable or odd or suspicious is now, because of the relationship and trust that is built, is no longer something that raises a flag in the mind of the victim or the people close to them.

Q    And so in your investigation in this matter, did you -- you already testified, I believe it was yesterday, about the grooming patterns you saw prior -- during your interview in July.

Was there anything in the October interview with [SS] that indicated the same signals or same evidence?

A    Yes. In [this] contact with [SS], she mentioned some of the things that I had discussed yesterday as far as the contacts, the social media interactions, the describing of the defendant as her best friend. And then, furthermore, in the second interview in October, she even described him as a boyfriend.

Q    And any other -- did you see any other indications of what you would be looking for as grooming in your investigation?

A    I saw also the interactions with the family, as we just mentioned earlier, that seemed consistent with grooming behavior. Obviously, they did not appear to have a relationship -- an ongoing relationship. [VL and SS] didn't know the defendant until after the funeral. And then based on my interviews, it seemed like he was then a part of their lives more and more going forward and spending time and doing things around the whole . . . family that was not occurring prior to the funeral.

Q    And between the interview in July and the October interview, was that still going on, that relationship?

10

A       Yes.   I'd gathered that from my continued investigation that the relationship and spending time with the defendant and the family did not cease.

Q       Did it ever discontinue?

A       Yes.   To my knowledge it was discontinued when [SS] came forward with the note that she gave to her teacher at that time and the investigation started again actively.

[¶29] Mr. Ingersoll claims Sergeant Hill's testimony defining grooming, stating Mr. Ingersoll's behavior toward SS satisfied that definition, and stating Mr. Ingersoll was grooming SS constituted an improper opinion of his guilt.[1]

[¶30] Our precedent makes a distinction between testimony which makes the ultimate conclusion of guilt, which is improper, and that which simply informs the jury about the meaning and significance of evidence and leaves the ultimate conclusion of guilt for the jury, which is not improper.  For example, in *Stephens v. State*, 774 P.2d 60, 65-67 (Wyo. 1989), *overruled on other grounds by Large v. State*, 2008 WY 22, 177 P.3d 807 (Wyo. 2008), several experts testified the victim had been sexually abused and Mr. Stephens was the perpetrator.  We concluded such testimony improperly opined that Mr. Stephens was guilty.  *Id*. at 67.  Similarly, in *Carter,* 2012 WY 109, 282 P.3d 16*,* after describing the drugs and drug paraphernalia found in Mr. Carter's possession and at his residence, the prosecutor asked the investigating agent:  "What would you as an expert conclude from that as to whether or not he is simply a user or whether he might be a dealer?"  *Id., ¶* 10, 282 P.3d at 169-70.  The agent responded:

The totality of the circumstances is what I would have to base any decision on when I'm looking at a circumstance like this. With pay/owe sheets and profit and loss statements or sheets,

---

[1] In discussing the first prong of plain error review with respect to Sergeant Hill's testimony, Mr. Ingersoll asserts:  "The errors alleged are that Sergeant Hill was a lay witness who[] vouched for [SS] and [VS]'s statements under the objectionable 'were-they-lying' question, the multiple hearsay statements of the alleged victim, and Sergeant Hill's statement of defendant's guilt by providing testimony that Mr. Ingersoll groomed [SS] for sexual assault."  In addressing the second prong of plain error review, however, Mr. Ingersoll argues only that Sergeant Hill's testimony improperly commented on his guilt.  Because Mr. Ingersoll provides no cogent argument or pertinent legal authority with respect to his claims concerning vouching and hearsay, we will not address them.  *See Pier v. State*, 2019 WY 3, ¶ 26, 432 P.3d 890, 898 (Wyo. 2019) ("We do not address arguments not supported by cogent argument or citation to pertinent authority." (citing *Blevins v. State*, 2017 WY 43, ¶ 22, 393 P.3d 1249, 1254 (Wyo. 2017))).  Similarly, although Mr. Ingersoll notes several times in his brief that Sergeant Hill was testifying as a lay witness, he does not argue grooming evidence must be provided by an expert.  In any event, the rule prohibiting a witness from opining on the guilt of an accused applies to both expert and lay witnesses.  *Carter*, ¶ 11, 282 P.3d at 170 ("This Court's rule is well established: A witness, lay or expert, may not express an opinion as to the guilt of the accused.") (citations omitted).

11

scales, packaging material, surveillance equipment, I would find that indicative of a drug dealer.

*Id.*, ¶ 10, 282 P.3d at 170. We concluded the agent's testimony went "'well beyond simply summarizing the facts of his investigation'" and drew the ultimate conclusion that Mr. Carter was guilty. *Id.*, ¶ 14, 282 P.3d at 170 (quoting *Bennett v. State*, 794 P.2d 879, 882 (Wyo. 1990)).

[¶31]  In contrast, in *Cureton v. State*, 2007 WY 168, ¶ 8, 169 P.3d 549, 551 (Wyo. 2007), a police officer testified those who sell methamphetamine often use it and possession of a large quantity of drugs could be for either personal use or for resale. As a result, to determine whether a person in possession of a large quantity of methamphetamine intends to sell it, he told the jury "one [has] to consider other factors such as the presence of packaging materials, scales, large amounts of cash or other items of value, and pay/owe sheets upon which drug transactions are recorded." *Id*. The officer opined that the presence of several of these factors in a case suggests that the methamphetamine is being sold. *Id*. We determined the officer's testimony did not constitute an opinion of guilt because "[the officer] never testified or offered a conclusion about whether the [defendant] was a drug dealer or that she was guilty of any particular offense. The officer's testimony merely informed the jury about the meaning and significance of certain items of physical evidence collected at the scene[] and left the ultimate conclusion for the jury." *Id.*, ¶ 11, 169 P.3d at 551. Likewise, in *Nielsen*, ¶¶ 4-6, 11-14, 430 P.3d at 745-46, several experts opined the victim's injuries were consistent with child abuse and non-accidental trauma, which refuted Mr. Nielsen's defense that the victim's head injury was accidental. We concluded: "While the challenged expert testimony . . . had a devastating impact on Mr. Nielsen's case, it merely informed the jury about the meaning and significance . . . of medical evidence, and . . . did not offer a conclusion as to Mr. Nielsen's guilt." *Id.*, ¶ 28, 430 P.3d at 749 (citation and internal quotations omitted).

[¶32]  Sergeant Hill's testimony did not improperly opine as to Mr. Ingersoll's guilt. He informed the jury that child sexual offenders often groom their victims and defined and provided examples of grooming. He then stated the evidence in this case included several "signs" or "indications" that Mr. Ingersoll was grooming SS. Sergeant Hill did not opine or make an "actual conclusion" that Mr. Ingersoll was, in fact, grooming SS or that Mr. Ingersoll sexually abused SS. He "merely informed the jury about the meaning and significance" of certain evidence in the case and left the ultimate conclusion of Mr. Ingersoll's guilt for the jury. *See Nielsen*, ¶ 28, 430 P.3d at 749; *Cureton*, ¶ 11, 169 P.3d at 551.

### B. Cumulative Error

[¶33]  Mr. Ingersoll claims the cumulative effect of the errors he asserted above deprived him of a fair trial. "Cumulative error occurs when 'two or more individually harmless

errors ha[ve] the potential to prejudice the defendant to the same extent as a single reversible error.'" *Watts v. State*, 2016 WY 40, ¶ 23, 370 P.3d 104, 112 (Wyo. 2016) (quoting *Guy v. State*, 2008 WY 56, ¶ 45, 184 P.3d 687, 701 (Wyo. 2008)) (other citation omitted). "When performing a cumulative error analysis, 'we consider only matters that were determined to be errors, and not any matter assigned as error but determined not to be erroneous.'" *Hicks v. State*, 2021 WY 2, ¶ 40, 478 P.3d 652, 663 (Wyo. 2021) (quoting *Sweet v. State*, 2010 WY 87, ¶ 40, 234 P.3d 1193, 1207 (Wyo. 2010)) (other citation omitted). Because no error occurred, there can be no cumulative error. *Id.*

## CONCLUSION

[¶34] Because the State's witnesses did not vouch for the credibility of other witnesses or offer opinions as to his guilt, Mr. Ingersoll failed to establish the district court committed plain error by allowing the subject testimony. In the absence of any error, the cumulative error doctrine does not apply.

[¶35] Affirmed.

13